BARRENTINE ET ·AL. *v.* ARKANSAS-BEST FREIGHT
SYSTEM, INC., ET AL.

No. 79–2006.  Argued January 13, 1981—Decided April 6, 1981

BRENNAN, J., delivered the opinion of the Court, in which STEWART, WHITE, MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. BURGER, C. J., filed a dissenting opinion, in which REHNQUIST, J., joined, *post,* p. 746.

*David C. Vladeck* argued the cause for petitioners. With him on the briefs were *Alan B. Morrison* and *Arthur L. Fox II.*

*S. Walton Maurras* argued the cause and filed a brief for respondents.*

JUSTICE BRENNAN delivered the opinion of the Court.

The issue in this case is whether an employee may bring an action in federal district court, alleging a violation of

---

*Briefs of *amici curiae* urging reversal were filed by *Solicitor General McCree, Deputy Solicitor General Geller, Barbara E. Etkind, Donald S. Shire, Lois G. Williams,* and *Mary-Helen Mautner* for the United States; and by *J. Albert Woll* and *Laurence Gold* for the American Federation of Labor and Congress of Industrial Organizations.

the minimum wage provisions of the Fair Labor Standards Act, 52 Stat. 1060, as amended, 29 U. S. C. § 201 *et seq.*, after having unsuccessfully submitted a wage claim based on the same underlying facts to a joint grievance committee pursuant to the provisions of his union's collective-bargaining agreement.

## I

Petitioner truckdrivers are employed at the Little Rock terminal of respondent Arkansas-Best Freight Systems, Inc., an interstate motor carrier of freight. In accordance with federal regulations and Arkansas-Best's employment practices, petitioners are required to conduct a safety inspection of their trucks before commencing any trip, and to transport any truck failing such inspection to Arkansas-Best's on-premises repair facility. See 49 CFR §§ 392.7, 392.8 (1980). Petitioners are not compensated by their employer for the time spent complying with these requirements.[1]

Pursuant to the collective-bargaining agreement between Arkansas-Best and petitioners' union, respondent Local 878 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers, petitioner Barrentine and another driver filed a series of grievances against Arkansas-Best.[2] They alleged that Art. 50 of the collective-bargaining agreement, which requires Arkansas-Best to compensate

---

[1] Upon arriving at the terminal to begin a trip, an Arkansas-Best driver must "punch in" on a timeclock and perform certain preliminary office work. He is compensated for this time at an hourly rate. After completing this work, the driver must "punch out," locate his vehicle, and conduct the required pretrip safety inspection. If the vehicle passes inspection, the driver proceeds on his trip and is paid at the driving time rate. No claim is made for the pretrip inspection time in these circumstances. If the vehicle does not pass inspection, the driver must take the truck to Arkansas-Best's repair facility and "punch in" on a second timeclock. The approximately 15–30 minutes that elapse between the first "punch out" and the second "punch in" are not compensated and are the subject of petitioners' claim.

[2] The second driver, J. N. Scates, is no longer a party to this litigation.

its drivers "for all time spent in [its] service,"[3] entitled them to compensation for the pretrip inspection and transportation time.[4] Petitioners' union presented these grievances to a joint grievance committee for final and binding decision pursuant to Art. 44 of the collective-bargaining agreement.[5] The joint committee, composed of three representatives of the union and three representatives of the employer, rejected the grievances without explanation. App. 22.

In March 1977, petitioners filed this action in the United States District Court for the Eastern District of Arkansas.[6]

---

[3] Article 50 states in part:

"All employees covered by this Agreement shall be paid for all time spent in the service of the Employer. Rates of pay provided for by this Agreement shall be minimums. Time shall be computed from the time that the employee is ordered to report for work and registers in and until the time he is effectively released from duty. Such payment for employee's time when not driving shall be the hourly rate." App. 27.

[4] Respondents contend that the grievances presented a claim under the FLSA in addition to the claim under the collective-bargaining agreement. See id., at 21. Although neither the District Court nor the Court of Appeals addressed this contention, Judge Heaney, dissenting from the opinion of the Court of Appeals, concluded that petitioners had "no intent to submit the FLSA claim to arbitration and it was not submitted to arbitration." 615 F. 2d 1194, 1203 (CA8 1980). Because we hold that petitioners would not be precluded from bringing their action in federal court in either case, we need not resolve this factual dispute.

[5] Article 44 states in part:

"The Unions and the employers agree that there shall be no strikes, lockouts, tieups, or legal proceedings without first using all possible means of settlement as provided for in this Agreement and in the National Agreement, if applicable, of any controversy which might arise. Disputes shall first be taken up between the Employer and the Local Union involved. Failing adjustment by these parties, the following procedure shall then apply:

"(a) Where a State or Multiple State Committee, by a majority vote, settles a dispute no appeal may be taken to the Southern Conference Area Grievance Committee. Such decision will be final and binding on both parties." App. 24–25.

[6] Plaintiffs included Barrentine, Scates, three drivers whose claims were

732

In the first count of their complaint, petitioners alleged that the pretrip safety inspection and transportation time was compensable under the Fair Labor Standards Act, 29 U. S. C. § 201 *et seq.*,[7] and that they were accordingly entitled to the

later dismissed for failure to answer interrogatories, and four other drivers. Although these last four drivers never formally submitted grievances to the joint committee, the District Court refused to dismiss their complaints for failure to exhaust internal grievance and arbitration procedures, concluding that resort to those procedures would have been futile in light of the joint committee's denial of Barrentine's grievance. The District Court thus "treat[ed] the case as though each of the named plaintiffs had actually filed grievances which were considered and denied." App. to Pet. for Cert. 6a. The District Court's treatment of those claims was not challenged on appeal. 615 F. 2d, at 1197, n. 3. Because our holding does not depend on whether petitioners formally filed grievances, we need not address the correctness of the District Court's approach to the exhaustion issue.

[7] Petitioners principally relied upon § 6 (a) of the FLSA, 52 Stat. 1062, as amended, 29 U. S. C. § 206 (a), which provides:

"Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, . . . wages at the following rates: . . ."

Alternatively, they relied upon § 4 of the Portal-to-Portal Act of 1947 amendments to the FLSA, 61 Stat. 86, 29 U. S. C. § 254, which provides:

"(a) Except as provided in subsection (b) of this section, no employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938, as amended, . . . on account of the failure of such employer to pay an employee minimum wages, . . . for or on account of any of the following activities. . . .

"(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

"(2) activities which are preliminary to or postliminary to said principal activity or activities, which occur . . . prior to the time on any particular workday at which such employee commences . . . such principal activity or activities.

"(b) Notwithstanding the provisions of subsection (a) of this section which relieve an employer from liability and punishment with respect to an activity, the employer shall not be so relieved if such activity is compensable by either—

"(1) an express provision of a written or nonwritten contract in effect,

statutory remedy of actual and liquidated damages, costs, and reasonable attorney's fees.[8]  In the second count, petitioners alleged that the union and its president had breached the union's duty of fair representation, apparently by entering into a "side deal" with Arkansas-Best regarding compensation of the pretrip inspection and transportation time. With respect to this claim, petitioners sought to have the decision of the joint grievance committee set aside and to have proper compensation awarded under the collective-bargaining agreement.

The District Court addressed only the fair representation claim.  While it conceded that "the evidence seems . . . rather to predominate in favor of the finding that there was a side agreement" as petitioners alleged, it found that the existence of such an agreement did not in itself give rise to a breach of the union's duty of fair representation, because the labor laws permit "parties by their own actions . . . [to] fill in the gaps that always arise with a written instrument when you apply that instrument to a multiplicity of situations and practices."  App. to Pet. for Cert. 8a, 9a.  This rul-

---

at the time of such activity, between such employee, his agent, or collective-bargaining representative and his employer; or

"(2) a custom or practice in effect, at the time of such activity, at the establishment or other place where such employee is employed, covering such activity, not inconsistent with a written or nonwritten contract, in effect at the time of such activity, between such employee, his agent, or collective-bargaining representative and his employer."

See App. 3–7.

[8] Section 16 (b) of the Act, 52 Stat. 1069, as amended, 29 U. S. C. § 216 (b), provides:

"Any employer who violates the [minimum wage] provisions . . . of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, . . . and in an additional equal amount as liquidated damages. . . . The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."

734

ing was affirmed by a unanimous panel of the Court of Appeals for the Eighth Circuit, 615 F. 2d 1194, 1202 (1980), and is not challenged here.[9]

With one judge dissenting, the Court of Appeals also held that the District Court was correct in not addressing the merits of petitioners' FLSA claim. Emphasizing that national labor policy encourages arbitration of labor disputes, the court stated that "wage disputes arising under the FLSA . . . may be the subject of binding arbitration where the collective bargaining agreement so provides . . . at least in situations in which employees knowingly and voluntarily submit their grievances to arbitration under the terms of the agreement." *Id.*, at 1199. Finding that petitioners had voluntarily submitted their grievances to arbitration, the court concluded that they were barred from asserting their statutory wage claim in the subsequently filed federal-court action. *Id.*, at 1199–1200. We granted certiorari, 449 U. S. 819 (1980), and reverse.

II

Two aspects of national labor policy are in tension in this case. The first, reflected in statutes governing relationships between employers and unions, encourages the negotiation of terms and conditions of employment through the collective-bargaining process. The second, reflected in statutes governing relationships between employers and their individual employees, guarantees covered employees specific substantive rights. A tension arises between these policies when

[9] The District Court also noted that petitioners' collective-bargaining agreement, if read literally, would require compensation for the time in question, since "[t]here is no question that the driver when [inspecting the vehicle] is on the employer's business." App. to Pet. for Cert. 4a. Nonetheless, because it found no breach of the duty of fair representation, the court was obliged to let the decision of the joint committee stand with respect to the contractual claim. The Court of Appeals agreed with this conclusion, and also noted that the literal terms of the collective-bargaining agreement appeared to cover the disputed time. 615 F. 2d, at 1198.

the parties to a collective-bargaining agreement make an employee's entitlement to substantive statutory rights subject to contractual dispute-resolution procedures.

The national policy favoring collective bargaining and industrial self-government was first expressed in the National Labor Relations Act of 1935, 29 U. S. C. § 151 *et seq.* (the Wagner Act). It received further expression and definition in the Labor Management Relations Act, 1947, 29 U. S. C. § 141 *et seq.* (the Taft-Hartley Act). Predicated on the assumption that individual workers have little, if any, bargaining power, and that "by pooling their economic strength and acting through a labor organization freely chosen by the majority, the employees of an appropriate unit have the most effective means of bargaining for improvements in wages, hours, and working conditions," *NLRB* v. *Allis-Chalmers Mfg. Co.,* 388 U. S. 175, 180 (1967), these statutes reflect Congress' determination that to improve the economic well-being of workers, and thus to promote industrial peace, the interests of some employees in a bargaining unit may have to be subordinated to the collective interests of a majority of their co-workers. See *Vaca* v. *Sipes,* 386 U. S. 171, 182 (1967); 29 U. S. C. § 159 (a). The rights established through this system of majority rule are thus

> "protected not for their own sake but as an instrument of the national labor policy of minimizing industrial strife 'by encouraging the practice and procedure of collective bargaining.' 29 U. S. C. § 151." *Emporium Capwell Co.* v. *Western Addition Community Org.,* 420 U. S. 50, 62 (1975).

To further this policy, Congress has declared that

> "[f]inal adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement." 29 U. S. C. § 173 (d).

Thus, courts ordinarily defer to collectively bargained dispute-resolution procedures when the parties' dispute arises out of the collective-bargaining process. See, *e. g., Hines* v. *Anchor Motor Freight, Inc.*, 424 U. S. 554, 562–563 (1976); *Gateway Coal Co.* v. *Mine Workers*, 414 U. S. 368, 377–380 (1974); *Republic Steel Corp.* v. *Maddox*, 379 U. S. 650, 652–653 (1965); *Steelworkers* v. *Enterprise Wheel & Car Corp.*, 363 U. S. 593, 596 (1960); *Steelworkers* v. *Warrior & Gulf Navigation Co.*, 363 U. S. 574, 577–578, 582–583 (1960); *Steelworkers* v. *American Manufacturing Co.*, 363 U. S. 564, 566, 568 (1960); *Textile Workers* v. *Lincoln Mills*, 353 U. S. 448, 458–459 (1957).[10]

Respondents contend that the aspect of national labor policy encouraging collective bargaining and industrial self-government requires affirmance of the Court of Appeals. They note that the collective-bargaining agreement between Arkansas-Best and petitioners' union requires that "any controversy" between the parties to the agreement be resolved through the binding contractual grievance procedures. See n. 5, *supra*. They further note that Local 878 processed petitioners' grievances in accordance with those procedures, and that the District Court made an unchallenged finding that the union did not breach its duty of fair representation in doing so. Accordingly, they conclude that petitioners should be barred from bringing the statutory component of their wage claim in federal court.[11]

---

[10] As we stated in *Vaca* v. *Sipes*, 386 U. S. 171, 184 (1967), when an employee's claim "is based upon breach of the collective bargaining agreement, he is bound by terms of that agreement which govern the manner in which contractual rights may be enforced." Only if the arbitration process has been tainted, *e. g.*, by the union's breach of its duty of fair representation, may the employee pursue his grievance in the courts. *Hines* v. *Anchor Motor Freight, Inc.*, 424 U. S., at 567; *Vaca* v. *Sipes, supra*, at 186.

[11] As an alternative ground in support of affirmance, respondents assert that petitioners' claims should be barred because petitioners failed to comply with 29 U. S. C. § 216 (b), which provides:

"No employee shall be a party plaintiff to any [FLSA enforcement ac-

We reject this argument. Not all disputes between an employee and his employer are suited for binding resolution in accordance with the procedures established by collective bargaining. While courts should defer to an arbitral decision where the employee's claim is based on rights arising out of the collective-bargaining agreement, different considerations apply where the employee's claim is based on rights arising out of a statute designed to provide minimum substantive guarantees to individual workers.

These considerations were the basis for our decision in *Alexander* v. *Gardner-Denver Co.*, 415 U. S. 36 (1974). In that case, petitioner, a black employee, had been discharged by respondent employer, allegedly for producing too many defective parts. Claiming that his discharge was racially motivated, petitioner asked his union to pursue the grievance and arbitration procedure set forth in the collective-bargaining agreement. The union did so, relying on the nondiscrimination clause in the collective-bargaining agreement, but the arbitrator found that petitioner had been discharged for just cause. Petitioner then brought an action under Title VII of the Civil Rights Act of 1964 in Federal District Court based on the same facts that were before the arbitrator. The District Court granted summary judgment for the employer, holding that petitioner was bound by the prior adverse arbitral decision. The Court of Appeals affirmed.

This Court reversed, concluding that an employee's statutory right to a trial *de novo* under Title VII is not foreclosed by the prior submission of his discrimination claim to final arbitration under a collective-bargaining agreement. The Court found that in enacting Title VII, Congress had granted individual employees a nonwaivable, public law right to

tion] unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."

Even if this requirement were to apply to petitioners' suit, a nonclass action, it was satisfied when petitioners individually signed at least two sets of interrogatories.

738

equal employment opportunities that was separate and distinct from the rights created through the "majoritarian processes" of collective bargaining. *Id.*, at 51. Moreover, because Congress had granted aggrieved employees access to the courts, and because contractual grievance and arbitration procedures provided an inadequate forum for enforcement of Title VII rights, the Court concluded that Title VII claims should be resolved by the courts *de novo.*[12]

Respondents would distinguish *Gardner-Denver* on the ground that because petitioners' FLSA claim is based on a dispute over wages and hours, subjects at the heart of the collective-bargaining process, their claim is particularly well suited to resolution through collectively bargained grievance and arbitration procedures. But this contention misperceives the nature of petitioners' FLSA claim.[13]

---

[12] Cf. *U. S. Bulk Carriers, Inc.* v. *Arguelles*, 400 U. S. 351, 357 (1971) (seaman may assert wage claim in federal court under the Seaman's Wage Act, 46 U. S. C. § 596, even though he had not previously pursued arbitral remedies provided by contractual grievance procedures); *McKinney* v. *Missouri-Kansas-Texas R. Co.*, 357 U. S. 265, 268–270 (1958) (employee returning from military service need, not pursue grievance and arbitration procedure prior to asserting seniority rights in federal court under Universal Military Training and Service Act).

[13] There are three components to petitioners' FLSA claim. First, they contend that the pretrip inspection and transportation time is compensable under § 6 of the FLSA, 29 U. S. C. § 206, because it constitutes "principal" rather than "preliminary" activity under § 4 of the Portal-to-Portal Act amendments, 29 U. S. C. § 254. See *Steiner* v. *Mitchell*, 350 U. S. 247 (1956). Second, they contend that even if it is preliminary activity, it is compensable under § 4 (b) (1) of the Portal-to-Portal Act amendments, 29 U. S. C. § 254 (b) (1), because it constitutes "time spent in the service of the Employer" under Art. 50 of the collective-bargaining agreement. Third, they contend that even if it is preliminary activity, and even if it is not compensable under "an express provision of a written [collective bargaining agreement]," 29 U. S. C. § 254 (b) (1), it is compensable under § 4 (b) (2) of the Portal-to-Portal Act amendments, 29 U. S. C. § 254 (b) (2), because there is "a custom or practice in effect" between Arkansas-Best and drivers in other terminals whereby those

The principal congressional purpose in enacting the Fair Labor Standards Act of 1938 was to protect all covered workers from substandard wages and oppressive working hours, "labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U. S. C. § 202 (a).[14]  In contrast to the Labor Management Relations Act, which was designed to minimize industrial strife and to improve working conditions by encouraging employees to promote their interests *collectively,* the FLSA was designed to give specific minimum protections to *individual* workers and to ensure that *each* employee covered by the Act would receive " '[a] fair day's pay for a fair day's work' " and would be protected from "the evil of 'overwork' as well as 'underpay.' "  *Overnight Motor Transportation Co.* v. *Missel,* 316 U. S. 572, 578 (1942), quoting 81 Cong. Rec. 4983 (1937) (message of President Roosevelt).[15]

---

drivers are compensated for their pretrip inspection and transportation time.

The threshold question in this action, then, is whether petitioners were engaged in "activities which are preliminary to [their] principal activity," 29 U. S. C. § 254 (a) (2), when they conducted the pretrip safety inspections of their vehicles.  Resolution of that question requires inquiry into whether the inspection and transportation procedures "are an integral and indispensable part of the principal activities for which [petitioners] are employed." *Steiner* v. *Mitchell, supra,* at 256 (changing clothes and showering are "principal" activities of employees working with dangerously caustic and toxic materials); see *Mitchell* v. *King Packing Co.,* 350 U. S. 260, 263 (1956) (knife sharpening is "principal" activity of butchers in meatpacking plant); 29 CFR §§ 790.7, 790.8 (1980).  For the reasons that follow, we conclude that this is a question of statutory construction that must be resolved by the courts.

[14] Congress enacted the FLSA under its commerce power, having found that the existence of such "detrimental" labor conditions would endanger national health and efficiency and consequently would interfere with the free movement of goods in interstate commerce.  See *United States* v. *Darby,* 312 U. S. 100, 109–110 (1941); 29 U. S. C. § 202 (a).

[15] In mandatory language, Congress provided in § 6 (a) of the Act, 29 U. S. C. § 206 (a), that "[e]very employer shall pay to each of his

The statutory enforcement scheme grants individual employees broad access to the courts. Section 16 (b) of the Act, 29 U. S. C. § 216 (b), which contains the principal enforcement provisions, permits an aggrieved employee to bring his statutory wage and hour claim "in any Federal or State court of competent jurisdiction." No exhaustion requirement or other procedural barriers are set up, and no other forum for enforcement of statutory rights is referred to or created by the statute.[16]

This Court's decisions interpreting the FLSA have frequently emphasized the nonwaivable nature of an individual employee's right to a minimum wage and to overtime pay under the Act. Thus, we have held that FLSA rights cannot be abridged by contract or otherwise waived because this would "nullify the purposes" of the statute and thwart the legislative policies it was designed to effectuate. *Brooklyn Savings Bank* v. *O'Neil,* 324 U. S. 697, 707 (1945); see *D. A. Schulte, Inc.* v. *Gangi,* 328 U. S. 108, 114–116 (1946); *Walling* v. *Helmerich & Payne, Inc.,* 323 U. S. 37, 42 (1944); *Overnight Motor Transportation Co.* v. *Missel, supra,* at 577; see 29 CFR § 785.8 (1974).[17] Moreover, we have held that congressionally granted FLSA rights take precedence over conflicting provisions in a collectively bargained compensation

employees . . . wages at the following rates . . . ." It provided in § 7 (a)(2) of the Act, 29 U. S. C. § 207 (a)(2), that "no employer shall employ any of his employees . . . for a workweek longer than forty hours . . . unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

[16] To encourage employees to enforce their FLSA rights in court, and thus to further the public policies underlying the FLSA, see *Brooklyn Savings Bank* v. *O'Neil,* 324 U. S. 697, 709 (1945), Congress has permitted individual employees to sue for back wages and liquidated damages and to receive reasonable attorney's fees and costs. 29 U. S. C. § 216 (b). In addition, Congress has empowered the Secretary of Labor to bring judicial enforcement actions under the Act. 29 U. S. C. §§ 216 (c), 217.

[17] But see 29 U. S. C. § 216 (c).

arrangement. See, *e. g., Martino* v. *Michigan Window Cleaning Co.,* 327 U. S. 173, 177–178 (1946); *Walling* v. *Harnischfeger Corp.,* 325 U. S. 427, 430–432 (1945); *Jewell Ridge Coal Corp.* v. *Mine Workers,* 325 U. S. 161, 166–167, 170 (1945).[18] As we stated in *Tennessee Coal, Iron & R. Co.* v. *Muscoda Local No. 123,* 321 U. S. 590, 602–603 (1944) (footnote omitted):

> "The Fair Labor Standards Act was not designed to codify or perpetuate [industry] customs and contracts. . . . Congress intended, instead, to achieve a uniform national policy of guaranteeing compensation for all work or employment engaged in by employees covered by the Act. Any custom or contract falling short of that basic policy, like an agreement to pay less than the minimum wage requirements, cannot be utilized to deprive employees of their statutory rights."[19]

---

[18] "[N]othing to our knowledge in any act authorizes us to give decisive weight to contract declarations as to the regular rate because they are the result of collective bargaining." *Bay Ridge Operating Co.* v. *Aaron,* 334 U. S. 446, 463 (1948). "[E]mployees are not to be deprived of the benefits of the Act simply because they are well paid or because they are represented by strong bargaining agents." *Jewell Ridge Coal Corp.,* 325 U. S., at 167.

[19] It is true that the FLSA, as amended, includes a number of references to collective-bargaining agreements. See *Tennessee Coal, Iron & R. Co.* v. *Muscoda Local No. 123,* 321 U. S., at 602, n. 18. Sections 7 (b) (1) and (2) of the FLSA, 29 U. S. C. §§ 207 (b) (1) and (2), state that an employer need not pay overtime under the Act for an employee's performance of work in excess of the statutory maximum, if the employee is employed "in pursuance of an agreement [containing alternative maximum hours provisions] made as a result of collective bargaining by representatives of employees certified as bona fide by the National Labor Relations Board." Section 3 (o) of the Portal-to-Portal Act amendments, 29 U. S. C. § 203 (o), excludes from the definition of "hours worked" under §§ 6 and 7 of the FLSA, "any time spent in changing clothes or washing at the beginning or end of each workday" if that time was noncompensable "under a bona fide collective-bargaining agreement." And § 4 (a) (2) of that Act, 29 U. S. C. § 254 (a) (2), which excludes from compensable

There are two reasons why an employee's right to a minimum wage and overtime pay under the FLSA might be lost if submission of his wage claim to arbitration precluded him from later bringing an FLSA suit in federal court. First, even if the employee's claim were meritorious, his union might, without breaching its duty of fair representation, reasonably and in good faith decide not to support the claim vigorously in arbitration. Wage and hour disputes that are subject to arbitration under a collective-bargaining agreement are invariably processed by unions rather than by individual employees. Since a union's objective is to maximize overall compensation of its members, not to ensure that each employee receives the best compensation deal available, cf. *Gardner-Denver*, 415 U. S., at 58, n. 19, a union balancing individual and collective interests might validly permit some employees' statutorily granted wage and hour benefits to be sacrificed if an alternative expenditure of resources would result in increased benefits for workers in the bargaining unit as a whole.[20]

---

time "preliminary" or "postliminary" working activities, requires compensation under the minimum wage provisions if a collective-bargaining agreement in effect between the employer and the employee's union makes that time compensable. See also 29 U. S. C. §§ 207 (e)(7), (f). Where plaintiff's claim depends upon application of one of these exceptions, we assume without deciding that a court should defer to a prior arbitral decision construing the relevant provisions of the collective-bargaining agreement. In this case, however, petitioners' threshold claim does not depend upon application of any of those exceptions. The contention that petitioners were engaged in compensable "principal" activity when conducting the pretrip safety inspections is a claim that arises wholly independently of the collective-bargaining agreement. Accordingly, deference to the prior arbitral decision in this case would be inappropriate. See n. 13, *supra*.

[20] Cf. *Humphrey* v. *Moore*, 375 U. S. 335, 349 (1964) ("we are not ready to find a breach of the collective bargaining agent's duty of fair representation in taking a good faith position contrary to that of some individuals whom it represents nor in supporting the position of one group of employees against that of another"); *Ford Motor Co.* v. *Huffman*, 345 U. S. 330, 337–339 (1953).

Second, even when the union has fairly and fully presented the employee's wage claim, the employee's statutory rights might still not be adequately protected. Because the "specialized competence of arbitrators pertains primarily to the law of the shop, not the law of the land," *id.*, at 57; see *Steelworkers* v. *Warrior & Gulf Navigation Co.*, 363 U. S., at 581–582, many arbitrators may not be conversant with the public law considerations underlying the FLSA.[21] FLSA claims typically involve complex mixed questions of fact and law—*e. g.*, what constitutes the "regular rate," the "workweek," or "principal" rather than "preliminary or postliminary" activities. These statutory questions must be resolved in light of volumes of legislative history and over four decades of legal interpretation and administrative rulings. Although an arbitrator may be competent to resolve many preliminary factual questions, such as whether the employee "punched in" when he said he did, he may lack the competence to decide the ultimate legal issue whether an employee's right to a minimum wage or to overtime pay under the statute has been violated.[22]

---

[21] We have noted that "a substantial proportion of labor arbitrators are not lawyers," *Gardner-Denver*, 415 U. S., at 57, n. 18; see also *Bernhardt* v. *Polygraphic Co.*, 350 U. S. 198, 203 (1956), and this is particularly true with respect to most members of joint grievance committees, who are drawn from the ranks of management and union leadership.

[22] We do not hold that an arbitral decision has no evidentiary bearing on a subsequent FLSA action in court. As we decided in *Gardner-Denver*, such a decision may be admitted into evidence, but

"[w]e adopt no standards as to the weight to be accorded an arbitral decision, since this must be determined in the court's discretion with regard to the facts and circumstances of each case. Relevant factors include the existence of provisions in the collective bargaining agreement that conform substantially with [the statute], the degree of procedural fairness in the arbitral forum, adequacy of the record with respect to the issue of discrimination, and the special competence of particular arbitrators. Where an arbitral determination gives full consideration to an employee's

Moreover, even though a particular arbitrator may be competent to interpret and apply statutory law, he may not have the contractual authority to do so. An arbitrator's power is both derived from, and limited by, the collective-bargaining agreement. *Gardner-Denver,* 415 U. S., at 53. He "has no general authority to invoke public laws that conflict with the bargain between the parties." *Ibid.* His task is limited to construing the meaning of the collective-bargaining agreement so as to effectuate the collective intent of the parties. Accordingly,

> "[i]f an arbitral decision is based 'solely upon the arbitrator's view of the requirements of enacted legislation,' rather than on an interpretation of the collective-bargaining agreement, the arbitrator has 'exceeded the scope of the submission,' and the award will not be enforced." *Ibid.,* quoting *Steelworkers* v. *Enterprise Wheel & Car Corp.,* 363 U. S., at 597.

Because the arbitrator is required to effectuate the intent of the parties, rather than to enforce the statute, he may issue a ruling that is inimical to the public policies underlying the FLSA, thus depriving an employee of protected statutory rights.[23]

Finally, not only are arbitral procedures less protective of individual statutory rights than are judicial procedures, see

---

[statutory] rights, a court may properly accord it great weight. This is especially true where the issue is solely one of fact, specifically addressed by the parties and decided by the arbitrator on the basis of an adequate record. . . ." 415 U. S., at 60, n. 21.

See also n. 19, *supra.*

[23] Even where the crucial provision in the collective-bargaining agreement incorporates the statutory language, as in *Gardner-Denver,* "the arbitrator has authority to resolve only questions of contractual rights, and this authority remains regardless of whether certain contractual rights are similar to, or duplicative of, the substantive rights secured by [the statute]." 415 U. S., at 53–54.

*Gardner-Denver, supra,* at 57–58, but arbitrators very often are powerless to grant the aggrieved employees as broad a range of relief. Under the FLSA, courts can award actual and liquidated damages, reasonable attorney's fees, and costs. 29 U. S. C. § 216 (b). An arbitrator, by contrast, can award only that compensation authorized by the wage provision of the collective-bargaining agreement. He "is confined to interpretation and application of the collective bargaining agreement" and his "award is legitimate only so long as it draws its essence from the collective bargaining agreement." *Steelworkers* v. *Enterprise Wheel & Car Corp., supra,* at 597. It is most unlikely that he will be authorized to award liquidated damages, costs, or attorney's fees.

### III

In sum, the FLSA rights petitioners seek to assert in this action are independent of the collective-bargaining process. They devolve on petitioners as individual workers, not as members of a collective organization. They are not waivable. Because Congress intended to give individual employees the right to bring their minimum-wage claims under the FLSA in court, and because these congressionally granted FLSA rights are best protected in a judicial rather than in an arbitral forum, we hold that petitioners' claim is not barred by the prior submission of their grievances to the contractual dispute-resolution procedures. As we stated in *Gardner-Denver:*

> "In submitting his grievance to arbitration, an employee seeks to vindicate his contractual right under a collective-bargaining agreement. By contrast, in filing a lawsuit under [the statute], an employee asserts independent statutory rights accorded by Congress. The distinctly separate nature of these contractual and statutory rights is not vitiated merely because both were violated as a result of the same factual occurrence. And certainly no inconsistency results from permitting both

rights to be enforced in their respectively appropriate forums." 415 U. S., at 49–50.

*Reversed.*

CHIEF JUSTICE BURGER, with whom JUSTICE REHNQUIST joins, dissenting.

The Court today moves—rather blithely, so it seems to me, and unnecessarily—in a direction counter to the needs and interests of workers and employers and contrary to the interests of the judicial system. It does so on the theory that this result advances congressional policy, but careful analysis reveals that Congress, if anything, has mandated the contrary. With funds appropriated by Congress, the Executive Branch, through the Department of Justice, and the Judicial Branch have undertaken studies and pilot programs to remove just such routine and relatively modest-sized claims as this from the courts. Today, the Court moves in precisely the opposite direction, ignoring the objectives of Congress, the agreement of the parties, and the common sense of the situation. It moves toward making federal courts small claims courts contrary to the constitutional concept of these courts as having special and limited jurisdiction.

I

I agree, of course, that the congressionally created right of individual workers to a minimum wage under § 6 of the Fair Labor Standards Act, 29 U. S. C. § 206, may not be waived through a collective-bargaining agreement between an employer and the workers' union or through a direct agreement between an individual worker and the employer. *Brooklyn Savings Bank* v. *O'Neil,* 324 U. S. 697, 707 (1945). I also agree that the Act creates a private cause of action to vindicate the right to a minimum wage. Fair Labor Standards Act § 16, 29 U. S. C. § 216. But it is a different—indeed, a totally different—proposition to say that employees and employers may not agree to a means of enforcing the employees'

routine wage claims outside the costly, cumbersome judicial process of the federal courts and, specifically, that employees, acting through their union in an arm's-length negotiation with the employer, may not bind themselves—as the petitioners did here—to submit to final and binding arbitration "any controversy that might arise," App. 24, rather than resolve it through litigation in the federal courts. The existence of a right and the provision of a judicial forum do not necessarily make either nonwaivable; if that were so, all the holdings of this Court and countless decisions of federal and state courts that parties are bound by contracts to arbitrate are placed in doubt. "[T]he question of whether the statutory right may be waived depends upon the intention of Congress as manifested in the particular statute." *Brooklyn Savings Bank* v. *O'Neil, supra,* at 705.

Unfortunately, neither the parties nor the United States as *amicus curiae* can point to a clear answer to this question in the legislative history of the Fair Labor Standards Act. It is hornbook law, however, that there is a strong congressional policy favoring grievance procedures and arbitration as a method of resolving labor disputes. See Labor Management Relations Act, §§ 201 (b), 203 (d), 29 U. S. C. §§ 171 (b), 173 (d); Norris-LaGuardia Act, § 8, 29 U. S. C. § 108. This Court has acknowledged that policy in the past. See, *e. g., Steelworkers* v. *Warrior & Gulf Navigation Co.,* 363 U. S. 574, 578, and n. 4 (1960); *Steelworkers* v. *Enterprise Wheel & Car Corp.,* 363 U. S. 593, 596 (1960); *Textile Workers* v. *Lincoln Mills,* 353 U. S. 448, 458–459 (1957). The Court today pays lipservice to that congressional policy, *ante,* at 734–736, but then—paradoxically—ignores it.

The reasons for favoring arbitration are as wise as they are obvious: litigation is costly and time consuming, and, more to the point in this case, judges are less adapted to the nuances of the disputes that typically arise in shops and factories than shop stewards, business agents, managerial supervisors, and the traditional ad hoc panels of factfinders. See, *e. g., Steel-*

*workers* v. *Warrior & Gulf Navigation Co., supra,* at 581–582. By bringing together persons actually involved in the workplace, often assisted by a neutral arbitrator experienced in such matters, disputes are resolved more swiftly and cheaply. This mechanism promotes industrial harmony and avoids strikes and conflicts; it provides a swift, fair, and inexpensive remedy.

The policy of favoring extrajudicial methods of resolving disputes is reflected in other areas as well. With federal courts flooded by litigation increasing in volume, in length, and in a variety of novel forms,[1] the National Institute of Justice, under the leadership of Attorney General Griffin Bell, in 1979 launched a multimillion-dollar program of field studies to test whether mediation at a neighborhood level could resolve small disputes out of courts in a fashion satisfactory to the parties. Neighborhood Justice Centers Field Test: Final Evaluation Report 7–8 (1980). The results of this study—and other similar studies financed by private sources[2]—confirmed what many had long suspected: small disputes may be resolved more swiftly and to the satisfaction of the parties without employing the cumbersome, time-consuming, and expensive processes of litigation.[3] The National

---

[1] Civil filings in fiscal year 1960 were 59,284; in 1980 they were 168,789, an increase of 184.7%. Even with the increases in numbers of judges, the number of cases per judge has risen 35.1%, from 242 to 327. Annual Report of the Director, Administrative Office of U. S. Courts 3 (1980). During this same period, the number of appeals docketed in the Courts of Appeals rose from 3,899 to 23,200, 495.0%, and the caseload per panel increased from 172 to 527, or 206.4%. *Id.,* at 1.

[2] See Dispute Resolution, 88 Yale L. J. 905 (1979). In 1976 the Judicial Conference of the United States joined with the Conference of Chief Justices and the American Bar Association to sponsor a conference to search for ways of improving justice, with emphasis on alternative means of resolving disputes. See The Pound Conference: Perspectives on Justice in the Future (West Pub. Co. 1979).

[3] Of 3,947 "cases"—*i. e.,* matters—voluntarily referred to these centers in the three study cities (Atlanta, Kansas City, and Los Angeles), 45% were

Institute of Justice recommended further study and implementation of similar procedures. Neighborhood Justice Centers Field Test, *supra*, at 108–109. Congress itself has recognized this problem and authorized such studies. Dispute Resolution Act, 94 Stat. 17.

## II

By rejecting binding arbitration for resolution of this relatively simple wage claim arising under the Fair Labor Standards Act, the Court thereby rejects as well a policy Congress has followed for at least half a century throughout the field of labor relations and now being applied in other areas as well. To reach that strange result, the Court relies on our holding in *Alexander* v. *Gardner-Denver Co.*, 415 U. S. 36 (1974). But that case in no sense compels today's holding. The congressionally created right under Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e *et seq.*, was aimed at guaranteeing a workplace free from *discrimination,* racial and otherwise. That fundamental right is not and should not be subject to waiver by a collective-bargaining agreement negotiated by a union. But there obviously is a vast difference between resolving allegations of discrimination under the Civil Rights Act and settling a relatively typical and simple wage dispute such as we have here when the parties have expressly agreed to resolve such grievances by arbitration.

The long history of union discrimination against minorities

---

resolved in some form, either through a hearing or simply by placing the parties in contact with each other. Neighborhood Justice Centers Field Test: Final Evaluation Report 26 (1980). Resolution came within a matter of days or weeks. *Ibid.* Interviews were conducted with one or both disputants in 63% of the mediated cases six months later. For both complainants and respondents, 88% were satisfied with the experience; 80% of complainants and 83% of respondents were satisfied with the agreement reached. In addition, over two-thirds felt that the adverse party had kept the bargain, and fewer than 30% felt that additional problems had arisen. *Id.*, at 45–50.

and women, now happily receding,[4] led Congress to forbid discrimination by unions as well as employers. See 42 U. S. C. § 2003e–2 (c). Against a background of union discrimination, Congress was aware that, in the context of claims under the Civil Rights Act, unions sometimes had been the adversary of workers. Plainly, it would not comport with the congressional objectives behind a statute seeking to enforce civil rights protected by Title VII to allow the very forces that had practiced discrimination to contract away the right to enforce civil rights in the courts. For federal courts to defer to arbitral decisions reached by the same combination of forces that had long perpetuated invidious discrimination would have made the foxes guardians of the chickens. But this case is not a discrimination case.

Even beyond the historical fact of union discrimination, we observed in *Gardner-Denver* that arbitrators are not likely to have the needed experience to deal with the special issues arising under the Civil Rights Act, a statute "whose broad language frequently can be given meaning only by reference to public law concepts." 415 U. S., at 57. Leaving resolution of discrimination claims to persons unfamiliar with the congressional policies behind that statute could have undermined enforcement of fundamental rights Congress intended to protect. But the "tension" seen by the Court in *Gardner-Denver, ante,* at 734, is simply not present here.

A dispute over wages under the Fair Labor Standards Act arises in an entirely different historical and legal context. In that setting, the union and the employee are the traditional allies, united in enforcing wage claims of employees individually as well as collectively. The Court distorts the possibility that union leadership might fail to protect members' interests in a wage dispute. *Ante,* at 742. If this rare exception arose, protection of the employee is abundantly

---

[4] See, *e. g., Steelworkers* v. *Weber,* 443 U. S. 193, 198, and n. 1 (1979), and sources cited therein; *id.,* at 218 (BURGER, C. J., dissenting).

available by way of the cause of action for breach of the union's duty of fair representation. See *Vaca* v. *Sipes,* 386 U. S. 171 (1967).[5]

Despite the Court's contrary view, *ante,* at 743–744, whether the time spent in the driver's inspection of a vehicle before taking to the road, as required by federal law, and in transportation of the vehicle to a repair facility when necessary constituted "compensable time" under "Federal Wage Laws," App. 21 (petitioner Barrentine's grievance), is a factual question well suited for disposition by grievance processes and arbitration. The following factors are relevant:

> (a) the vehicle inspection was mandated, not by the employer, but by a federal regulation, 49 CFR § 392.7 (1980);
>
> (b) the regulation places the responsibility to inspect the vehicle on *the driver* directly;
>
> (c) the inspection is intended primarily for the benefit of the public;
>
> (d) the petitioners' claim is one for wages; and
>
> (e) the bargaining over wages, which produced a rate well above the statutory minimum wage, presumably took into account the time spent by drivers in complying with federal requirements.

This elementary wage dispute falls well within the scope of traditional arbitration as it exists under countless collective-bargaining agreements, which the Court now channels into the federal courts. For years the labor movement has developed panels of persons acceptable to both sides who are

---

[5] Indeed, count 2 of the petitioners' complaint alleged that respondent Local 878 had breached its duty of fair representation. App. 7. The District Court expressly rejected that claim in its oral ruling, App. to Pet. for Cert. 12a, even though it found some evidence of a side agreement between Local 878 and the employer, *id.,* at 8a–11a. The petitioners have not challenged the findings of fact, and the Court of Appeals held they were not clearly erroneous. 615 F. 2d 1194, 1202 (CA8 1980).

familiar with "the law of the shop . . . [and] the demands and norms of industrial relations." *Alexander* v. *Gardner-Denver Co., supra,* at 57. The Court's generalizations about the powers of arbitrators, *ante,* at 744–745, are irrelevant; arbitrators have whatever power the parties confer upon them. Here, that power extends to *"any* controversy that might arise." App. 24 (emphasis added). Surely a wage claim is covered.

Allowing one party to such an elementary industrial dispute unilaterally to resort to the federal courts when an established, simplified, less costly procedure is available—and desired, as here, by the employer and the employee's union—can only increase costs and consume judicial time unnecessarily. It makes neither good sense nor sound law to read the broad language of *Gardner-Denver*—written in a civil rights *discrimination* case—to govern a routine wage dispute over a matter traditionally entrusted by the parties' arm's-length bargaining to binding arbitration.

## III

The Court seems unaware that people's patience with the judicial process is wearing thin. Its holding runs counter to every study and every exhortation of the Judiciary, the Executive, and the Congress urging the establishment of reasonable mechanisms to keep matters of this kind out of the courts. See The Pound Conference: Perspectives on Justice in the Future *passim* (West Pub. Co. 1979); American Bar Assn., Report on the National Conference on Minor Disputes Resolution *passim* (1978). The Federal Government, as I noted earlier, has spent millions of dollars in pilot programs experimenting in extrajudicial procedures for simpler mechanisms to resolve disputes. Approving an extrajudicial resolution procedure "is not a question of first-class or second-class . . . means. It is a matter of tailoring the means to the problem that is involved." Resolution of Minor Disputes, Joint Hearings before the Subcommittee on Courts,

Civil Liberties, and the Administration of Justice, House Committee on the Judiciary, and Subcommittee on Consumer Protection and Finance, House Committee on Interstate and Foreign Commerce, 96th Cong., 1st Sess., 28 (1979) (testimony of Assistant Attorney General Meador). This Court ought not be oblivious to desperately needed changes to keep the federal courts from being inundated with disputes of a kind that can be handled more swiftly and more cheaply by other methods.