2008 ME 155

**Gary QUINTAL**

v.

**CITY OF HALLOWELL et al.**

Supreme Judicial Court of Maine.

Argued: Nov. 7, 2007.
Decided: Oct. 7, 2008.

Edward R. Benjamin, Jr., Esq., Holli S. Boccelli, Esq. (orally), Thompson & Bowie, LLP, Portland, ME, for the City of Hallowell and James Rhodes.

Curtis Webber, Esq. (orally), Linnell, Choate & Webber, LLP, Auburn, ME, for Gary Quintal.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

CLIFFORD, J.

[¶ 1] Gary Quintal appeals from a summary judgment entered in the Superior Court (Kennebec County, *Studstrup, J.*) in favor of the City of Hallowell and James Rhodes. The summary judgment was entered on Quintal's complaint seeking review of the termination of his employment by the City pursuant to M.R. Civ. P. 80B, and alleging violations of Quintal's First and Fourteenth Amendment rights, violation of the Freedom of Access Act, and interference with Quintal's contractual relationship with the City. Quintal contends that the court erred in finding that no issues of material fact exist for trial, and in determining as a matter of law that binding arbitration pursuant to a collective bargaining agreement precluded Quintal from pursuing the Rule 80B appeal. We disagree with Quintal's contentions and affirm the judgment.

## I. BACKGROUND

[¶ 2] Viewing the evidence in the light most favorable to the nonmoving party, as we must do in reviewing a summary judgment, *Dep't of Agric., Food & Rural Res. v. Ouellette*, 2007 ME 117, ¶ 7, 930 A.2d 1037, 1038, the record contains the following facts. Quintal was hired by the City as Code Enforcement Officer, Building Inspector, and Plumbing Inspector for a one-year term, and as Health Officer for a three-year term, on June 10, 2002. He completed the required certifications and became a permanent employee of the City on January 2, 2003.

[¶ 3] In November of 2003, Quintal wanted to use some of his accumulated compensatory time (comp time). Normally, such time-off requests would be made to Rhodes, the City Manager. Rhodes was not available, however, so Quintal asked the City Clerk, who acted on requests for time off when the City Manager was absent. The City Clerk allowed Quintal to take the days off that he had requested.

[¶ 4] On November 12, 2003, when Quintal returned to work, Rhodes called

him into his office. Rhodes was angry that Quintal had taken the comp time without first receiving Rhodes's permission. Quintal pointed out that the union contract did not require employees to obtain permission to use comp time. Although Rhodes did not issue Quintal a reprimand, he told Quintal that "this will not be the end of this."

[¶ 5] Two days later, Rhodes issued an evaluation of Quintal on a form that Rhodes prepared specifically for that purpose. Rhodes described it as an "annual evaluation," but to Quintal's knowledge, it was the first such evaluation that Rhodes had done since he became City Manager.

[¶ 6] Rhodes evaluated Quintal as "minimally satisfactory" in four of thirteen performance categories. In the other nine categories, Rhodes rated Quintal "satisfactory." After the evaluation, Quintal's relationship with Rhodes continued to deteriorate.

[¶ 7] At some point in the fall of 2003, Rhodes had a conversation with the City's Police Chief, during which Rhodes told the Chief that as far as he was concerned, Quintal was "all done," and it was just a

question of putting together the paperwork to document his decision.

[¶ 8] Over the next several months, Quintal and Rhodes continued to have difficulties regarding Quintal's job performance. In January of 2004, Quintal received a letter from Rhodes offering him a three-month extension of his employment (as opposed to a renewal of the one-year contract). Quintal did not accept the extension.

[¶ 9] On February 5, 2004, Quintal issued a memorandum on City of Hallowell letterhead with Quintal's name, title, and contact information at the top. The "subject" of the memo was "preliminary investigation." Quintal sent the memorandum to the City Manager, the Mayor, Quintal's union steward, and the union president. The memorandum recited ten "issues."[1]

[¶ 10] On February 10, 2004, Rhodes sent Quintal a letter stating that the Personnel Committee, acting as hearing officers, would hold a just cause pre-termination hearing on February 26, 2004, to determine whether just cause existed to terminate Quintal's employment. The letter stated that the "grounds for removal

---

1. The memorandum stated the following:

   A preliminary investigation is under way to determine if a harassment complaint has any validity[.] Are the City employees working in a hostile environment?
   **ISSUES**
   1. Are the employees being asked to distance themselves away from the Granite City Employees['] Association?
   2. Have agreements been made against a select employee to over turn the Association'[s] agreement with the City?
   3. Are agreements being offered to select employee[s] to over turn the Association'[s] agreement with the City?
   4. Does the City have a justified position to have negative material remain in a personnel file for 6 years, (normal time frame[ ] is 1 year) or can this be considered a form of harassment?
   5. Is the City avoiding Maine State Statutes and the City Agreement with the Association to avoid paying the Code Enforcement Officer his duly earn[ed] compensation?
   6. Is a 10–day notice to use Vacation time or Compensatory [time] justified or a form of harassment?
   7. Has the City Manager retained City material/Resident information or necessary communications unfoundedly in his office to hamper the duties of the Code Officer?
   8. Has the City Manager filed with the City Insurance carrier, MMA, a first report of injury as a form of harassment?
   9. Does the City Manager have a behavioral problem that can be traced to past employers?
   10. Other issues that may have a bearing on the issue of a harassment complaint that may warrant further investigations[.]

are those raised in [Quintal's] performance evaluation and those raised in [Quintal's] reprimands." The letter also stated that "the City will present to the hearing officers your memorandum of February 5, 2004, on City Letterhead, with the subject line: Preliminary Investigation."

[¶ 11] The pretermination hearing was held on February 26, 2004. The Personnel Committee consisted of three members of the City Council; the Mayor was not one of the three members. At the conclusion of the hearing, the Personnel Committee unanimously voted that just cause to terminate Quintal existed.

[¶ 12] Quintal received a letter from Rhodes the next day informing him that the Personnel Committee was terminating his employment with the City as of February 27, 2004. The termination letter cited five reasons for the termination:

1. Violation of the City of Hallowell Personnel Regulations, Article XIII Employee Conduct, Section 13.8 *Absent Without Leave:* To wit absent . . . on December 11, 2003, without permission.

2. Violation of the City of Hallowell Personnel Regulations, Article XV, Section 15.4.D *Failure to Perform the Duties of One's Position:* To wit failure to perform your duties of staff support to the Hallowell Planning Board by not providing the December 17, 2003 Planning Board Agenda and supporting documents.

3. Violation of the City of Hallowell Personnel Regulations, Article XV, Section 15.4.B *Failure to Follow The Orders of One's Superior:* To wit not submitting the Code Enforcement Office Monthly Report by 3 PM on January 2, 2004.

4. Improper use of City Letterhead and abuse of power to conduct an unauthorized personal investigation of a City Employee giving the impression that the investigation was sponsored by the Hallowell City Government.

5. Below-average annual job performance evaluation.

[¶ 13] On March 2, 2004, the City's employees' union, Granite City Employees Association, filed a grievance, and requested that the Personnel Committee rescind the City's decision to terminate Quintal. The Personnel Committee denied the request in a decision that was drafted, at least in part, by the City's attorney.

[¶ 14] On March 29, 2004, union representative Richard Mersereau, acting on behalf of the union, filed a next step grievance under the collective bargaining agreement by requesting binding arbitration before the State Board of Arbitration and Conciliation to review the decision to terminate Quintal. An arbitration hearing before the Board was held. Mersereau, who is not an attorney, presented the union's case.[2]

[¶ 15] The arbitration panel issued a decision, unanimously concluding that there was just cause to terminate Quintal.

[¶ 16] Following the Personnel Committee's denial of his request that it rescind the decision to terminate, Quintal filed a four-count complaint against the City and Rhodes in the Superior Court. Count I of the complaint sought appellate review of the Personnel Committee's decision pursuant to M.R. Civ. P. 80B, on the basis that the Personnel Committee did not have the authority to render the decision and that, even if it did, there was insufficient evidence to support the Com-

2. Quintal's attorney was not allowed to participate in the proceedings, as the union's

case was presented by Mersereau, an experienced labor representative.

mittee's decision; Count II alleged violations of Quintal's First and Fourteenth Amendment rights; Count III alleged that the City held executive sessions in violation of the Freedom of Access Act; and Count IV alleged that Rhodes had interfered with Quintal's contractual relationship with the City. The Superior Court denied Quintal's motion for a partial summary judgment, and entered a summary judgment for the City and Rhodes on the Rule 80B claim. Quintal filed a motion for reconsideration, which the court denied. The court subsequently entered a summary judgment in favor of the City and Rhodes as to the remaining counts of the complaint, and this appeal by Quintal followed.

## II. DISCUSSION

### A. Rule 80B Appeal

[¶ 17] The court entered a summary judgment in favor of the City and Rhodes because it concluded that the issues raised by the 80B appeal had been resolved by the grievance procedure and binding arbitration. The collective bargaining agreement between the City and the Granite City Employee Association, of which Quintal is a member, provides a grievance procedure for employees. The first three steps of the procedure involve reporting any grievance up the chain of command. The fourth step is to present the grievance to the City Personnel Committee. The final step for an aggrieved employee is for the union to submit the grievance to bind-

ing arbitration. That is precisely the procedure that was followed in Quintal's case.

■ [¶ 18] Quintal argues that the procedure followed in his termination did not comport with 30-A M.R.S. § 2601-A (2007), 38 M.R.S. § 441 (2007), or the Hallowell City Charter.[3] Title 26 M.R.S. § 969 (2007), however, states that:

If a collective bargaining agreement between a public employer and a bargaining agent contains provisions for binding arbitration of grievances involving the following matters: ... removal, discharge[,] or discipline of any public employee, such provisions shall be controlling in the event they are in conflict with any authority and power, involving such matters, of any municipal civil service commission or personnel board or its agents.

Quintal was a City employee and was subject to the grievance procedure provided in the collective bargaining agreement. He invoked and participated in that procedure. Quintal cannot now invoke other procedures available under the City Charter or by statute.

■ [¶ 19] Furthermore, Quintal's reliance on this Court's decision in *Winston v. Maine Technical College System*, 631 A.2d 70 (Me.1993), is misplaced. In *Winston*, which involved a claim of discrimination on the basis of a mental handicap, the Court concluded that the case fell within the rule set forth by the United States Supreme Court "that the arbitration of contract-

---

**3.** Title 30-A M.R.S. § 2601-A (2007) states that municipal officers may remove code enforcement officers "only for cause after notice and hearing." Similarly, 38 M.R.S. § 441(1) (2007) states that "[t]he municipal officers may remove a code enforcement officer for cause, after notice and hearing." Title 30-A M.R.S. § 2001(10)(B) (2007) defines municipal officers as "[t]he mayor and alderman or councilors of a city." The Hallowell City

Charter states that "[a]ppointive officers and boards whose terms are specified in this charter or in the ordinances may be removed by the Council upon written charges and after a public hearing on the same." Hallowell, Me., City Charter art. VI, § 3(d) (2002). The Charter also states that the City Council shall be composed of the Mayor and seven members. Hallowell, Me., City Charter art. II, § 2(a).

based claims pursuant to a collective bargaining agreement does not preclude subsequent judicial resolution of statutory claims." *Id.* at 73 n. 5 (citing *McDonald v. City of W. Branch,* 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984); *Barrentine v. Arkansas–Best Freight Sys., Inc.,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981); *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974)). *Winston,* however, and the cases cited in *Winston,* involve substantive statutory rights protecting individual workers under the Fair Labor Standards Act, the right to bring a civil action for the deprivation of rights under 42 U.S.C. § 1983, and protection against discrimination based on race and mental health. *See Winston,* 631 A.2d at 73 n. 5; *McDonald,* 466 U.S. at 286, 104 S.Ct. 1799; *Barrentine,* 450 U.S. at 729–30, 101 S.Ct. 1437; *Alexander,* 415 U.S. at 38, 94 S.Ct. 1011. The rights at issue here are procedural. The only difference between Quintal's remedies pursuant to the statute and the City Charter, and the remedies available to Quintal pursuant to the collective bargaining agreement, is the people who vote to terminate his employment—three City Councilors pursuant to the collective bargaining agreement, or seven City Councilors and the Mayor pursuant to the City Charter and statute. These procedural differences do not impact the fundamental due process rights that Quintal is afforded pursuant to the statute, the City Charter, and the collective bargaining agreement.

[¶ 20] The issues raised in Quintal's appeal pursuant to M.R. Civ. P. 80B, in particular whether there was good cause to terminate Quintal's employment, were adjudicated in the arbitration proceeding, in which Quintal voluntarily participated. Quintal is now precluded from relitigating those issues in the Superior Court. *See* 26 M.R.S. § 969. The court correctly entered summary judgment on Quintal's Rule 80B appeal. *See Walton v. Me. Sch. Admin. Dist. 52,* 2008 ME 61, ¶ 7 n. 2, 945 A.2d 1241, 1243 (a party electing to have termination arbitrated does not get "a second bite at the apple in state court").

B.   Due Process

[¶ 21] Quintal also contends that the grievance procedure provided by the collective bargaining agreement denied him due process. We have stated that:

> Due process requires that a tenured public employee be given notice and an opportunity to be heard prior to termination. This pretermination hearing, however, need not be formal or elaborate, as long as the employee has the opportunity to tell his or her side of the story and explain why termination should not occur. The pretermination hearing is merely the employee's chance to clarify the most basic misunderstandings or to convince the employer that termination is unwarranted.

*Moen v. Town of Fairfield,* 1998 ME 135, ¶ 9, 713 A.2d 321, 324–25 (quotations and citations omitted).

[¶ 22] Quintal received a letter from Rhodes on February 10, 2004, advising him that the Personnel Committee would hold a pretermination hearing and that Rhodes would recommend that Quintal be terminated. Although the references in the letter to Quintal's prior performance evaluation and the February 5, 2004, memo did not provide Quintal with knowledge of each specific fact leading to his termination, such specific allegations were not necessary to meet due process requirements for notice.

[¶ 23] Quintal argues that the fact that the City Manager discussed Quintal's memo with the City Council, and that the members of the Personnel Committee and the City's attorney went into the City

Manager's office prior to his pretermination hearing, raises an issue of material fact as to whether the Personnel Committee prejudged his case. He also contends that the City's explanations for what occurred in the City Manager's office prior to his pretermination hearing were pretextual, and that a jury could infer an improper motive.[4] Even when viewed in the light most favorable to Quintal, however, those facts are insufficient on which to base a conclusion that Quintal's case was prejudged.

[¶ 24] Quintal also contends that the City's attorney's participation in drafting the Personnel Committee's denial of Quintal's request that the Committee rescind the termination decision implicates Quintal's right to due process, and raises a genuine issue of material fact as to whether those rights were violated. The record does not support Quintal's contention.

[¶ 25] First, the members of the Committee ultimately signed the decision denying reconsideration. Second, the cases on which Quintal relies to support his position involve a biased party's actual participation in making findings of fact, and participation in the decision by board members who did not take part in the hearing. *Pelkey v. City of Presque Isle*, 577 A.2d 341, 343 (Me.1990); *Mutton Hill Estates, Inc. v. Town of Oakland*, 468 A.2d 989, 992 (Me.1983). In this case, the City's attorney's assistance in drafting the denial came only after the Personnel Committee had reached its decision, and the attorney was asked to draft a decision.

C. First Amendment

[¶ 26] Quintal further contends that termination of his employment violated his First Amendment rights. He ar-

gues that the memorandum he sent using the City's letterhead was a matter of public concern, and therefore, it is protected speech and cannot be a basis for the termination of his employment. We disagree.

[¶ 27] To determine whether a public employee's speech is entitled to First Amendment protection, the court must first consider whether the employee made the speech while acting pursuant to his official job duties. *Garcetti v. Ceballos*, 547 U.S. 410, 421–22, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421, 126 S.Ct. 1951. Even if speech was not made pursuant to the employee's official job duties, however, if it does not involve a matter of public concern, the First Amendment does not protect it. *See Moen*, 1998 ME 135, ¶ 14, 713 A.2d at 325; *see also Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983).

[¶ 28] "The inquiry into the protected status of speech is one of law, not fact." *Connick*, 461 U.S. at 148 n. 7, 103 S.Ct. 1684; *see also Moen*, 1998 ME 135, ¶ 15, 713 A.2d at 325. We review questions of law de novo. *Moen*, 1998 ME 135, ¶ 15, 713 A.2d at 325.

[¶ 29] Quintal was not acting in his official capacity when he wrote the memorandum because he did not make the statements pursuant to his official duties as Code Enforcement Officer, Building Inspector, or Plumbing Inspector. Although not made pursuant to his official duties,

---

4. Quintal makes the same argument with respect to his claim under the Freedom of Access Act, 1 M.R.S. § 405(6)(A)(2) (2007).

Quintal's memorandum is not protected speech because speech regarding internal office polices, office morale, or confidence in supervisors is not of public concern if it is not related to the performance of job duties. *See Connick*, 461 U.S. at 148, 103 S.Ct. 1684. Here, as in *Connick*, the questions Quintal raised in his memorandum about an investigation are directed less at evaluating the performance of public officials, and more at Quintal's disputes with his superiors. *See id.* The memorandum did not address a matter of public concern.

[¶ 30]   Moreover, the memorandum was misleading in that Quintal entitled it "preliminary investigation," and wrote it using the City's letterhead, giving it the appearance of an official investigation being conducted by the City. Accordingly, the memorandum is not protected by the First Amendment and was properly considered as one of several reasons for Quintal's termination.

D.   Violation of the Freedom of Access Act

[¶ 31]   Section 407(2) of title 1 states that:

Every agency shall make a written record of every decision involving the dismissal . . . of any public official, employee or appointee.  The agency shall . . . set forth in the record the reason or reasons for its decision and make findings of fact, in writing, sufficient to appraise the individual concerned and any interested member of the public of the basis for the decision.

1 M.R.S. § 407(2) (2007).

[¶ 32]   The Personnel Committee voted unanimously to terminate Quintal.  Contrary to Quintal's contention that the City violated the Freedom of Access Act, the decision complied with the requirements of 1 M.R.S. § 407(2).  The decision included specific findings of fact and conclusions pursuant to section 407(2).  Moreover, section 407(2) does not require the Personnel Committee to vote as to each individual reason for termination.

E.   Immunity under Maine Tort Claims Act

[¶ 33]   The Superior Court concluded that Rhodes was immune from Quintal's suit pursuant to the Maine Tort Claims Act, which provides that:

[E]mployees of governmental entities shall be absolutely immune from personal civil liability for the following:

. . . .

C.   Performing or failing to perform any discretionary function or duty, whether or not the discretion is abused; and whether or not any statute, charter, ordinance, order, resolution, rule or resolve under which the discretionary function or duty is performed is valid;

. . . .

E.   Any intentional act or omission within the course and scope of employment;  provided that such immunity does not exist in any case in which an employee's actions are found to have been in bad faith.

14 M.R.S. § 8111(1)(C), (E) (2007).  Personal immunity is an affirmative defense to which the person asserting the defense bears the burden of proof.  *Danforth v. Gottardi*, 667 A.2d 847, 848 (Me.1995).

[¶ 34]   We have utilized a four-factor test to determine whether discretionary function immunity applies:

(1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program or objective?
(2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction

of the policy, program, or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?

*Roberts v. State of Maine*, 1999 ME 89, ¶ 8, 731 A.2d 855, 857 (quoting *Adriance v. Town of Standish*, 687 A.2d 238, 240 (Me. 1996)).

[¶ 35] Applying the four-factor test to the facts of this case, the court correctly determined that Rhodes was immune from the suit Quintal brought against him because: (1) it is the municipal government's objective to have employees that properly and efficiently perform the tasks assigned to them; (2) reprimanding an employee and recommending his termination is essential to effectuate that objective; (3) determining whether an employee is properly and efficiently discharging his duties requires, at least in part, the exercise of judgment; and (4) the City Manager is the appropriate person to make recommendations regarding the Code Enforcement Officer's job performance. Rhodes's actions were within his discretion, and even if he abused that discretion, immunity still applies to those actions. 14 M.R.S. § 8111(1)(C).

[¶ 36] Furthermore, we reject Quintal's argument that Rhodes is not entitled to immunity because he acted in bad faith in terminating Quintal's employment. Because Rhodes acted within his discretion pursuant to subparagraph C of section 8111, he is entitled to absolute immunity, and the bad faith exception under subparagraph E therefore does not apply. *See Berard v. McKinnis*, 1997 ME 186, ¶ 11 n. 7, 699 A.2d 1148, 1152.

The entry is:

Judgment affirmed.