**Joseph F. ABELS, et al., Plaintiffs,**

v.

**TITAN INTERNATIONAL, INC., and The French and Hecht Division Kelsey–Hayes Company Hourly–Rate Employees Pension Plan, Defendants.**

No. 3–98–CV–90074.

United States District Court, S.D. Iowa, Davenport Division.

Jan. 31, 2000.

Russell Woody, Chicago, IL, for Plaintiffs.

Patrick W. Driscoll, Rachel R. Watkins Schoenig, Davenport, IA, for Defendants.

## ORDER

PRATT, District Judge.

Before the Court are two Motions for Summary Judgment, filed respectively by

62 members of a local bargaining unit on October 15, 1999 and by the employer and its pension plan filed October 18, 1999. The parties have filed resistances and replies to each of the Motions for Summary Judgment. Plaintiffs seek a merits determination of their claims arising under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Defendants claim dismissal of this action is warranted under principles of res judicata. A hearing on both Motions was held January 26, 2000 at the United States Courthouse in Davenport, Iowa. The matter is fully submitted.

### I. Facts and Procedural Background

This is a labor dispute over retirement benefits between employees and their employer, Titan International, Inc. ("Titan") and their pension plan ("the Plan"). The case raises important questions concerning the role unions play in the collective bargaining process and on behalf of their members when federal statutory rights are implicated. Finally, and as burn out by Defendants' Motion, this case tests the limits to which principles of res judicata can govern the adjudication of workers' federal statutory rights when their Union, in a prior court action, has purportedly already spoken. A detailed description of the history of this litigation will be helpful in resolving the legal contentions raised by the parties.

Plaintiffs are 62 individuals who are, or were, hourly-rated production and maintenance employees employed by Titan at its Walcott, Iowa plant. At all material times relevant to this lawsuit, Titan's production and maintenance employees at the plant were represented by Local Lodge 2048 of the International Association of Machinists and Aerospace Workers, AFL—CIO ("the Union"). Each of the Plaintiffs in this lawsuit belongs to the Union, which is their exclusive certified bargaining representative.

The relationship between Titan and its workers is governed by a collective bargaining agreement ("CBA"). In 1993, Titan and the Union undertook important negotiations concerning the company's pension plan. During these negotiations, Titan allegedly made oral promises to preserve benefit rights under a provision commonly referred to as the "30–and–out" provision.[1] On July 12, 1993, the Union membership approved and ratified an amendment concerning the Plan. That amendment, which became part of the governing CBA, provided in relevant part:

> (b) The Defined Benefit Plan will be frozen with no loss of vested benefits as of July 12, 1993.

> (c) Employer will contribute to a new Union administered pension program, the sum of 10¢ per actual straight time hour worked for each employee with one (1) year seniority during the course of the Agreement. The Union shall provide all required Summary Plan Descriptions and reports as required by law.

*See* 1993 Agreement, Article XIX, ¶ 19:03(b), (c) (hereinafter "1993 Freeze Amendment"). At all times following ratification of the 1993 Freeze Amendment, Titan served as administrator of the Plan.

In February or March of 1995, Plaintiff Glenn Carlton had achieved 30 years of service with Titan. He applied for early retirement benefits under the "30 and out" provision. Titan denied that request because, as Titan interpreted the 1993 Freeze Amendment, he did not have 30 years of service as of July 12, 1993. This dismayed the Union (and Mr. Carlton) who apparently relied on the company's alleged

---

[1]. Under this provision, a worker with 30 or more years of credited service may retire at his or her option regardless of age. The benefit is $15 per month multiplied by years of service. *See* Complaint at 5–6, quoting Article II, Section 2(a)(3) of the Plan. Workers opting for pensions under the 30–and–out provision may qualify for a supplement payment for a total monthly benefit payment of $800. *See* Complaint at 6, quoting Article II, Section 7(a)(2) of the Plan.

promise in its vote to approve the 1993 Freeze Amendment that benefits under the 30–and–out provision would be unaffected. After Titan failed to reconsider its decision with respect to Mr. Carlton's request for 30–and–out benefits, the Union filed an unfair labor practice charge with the National Labor Relations Board (NLRB), charging Titan with having violated its duty under Section 8(a)(5) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(5) to bargain in good faith with the Union. On June 13, 1995, the NLRB, through its Regional Director, issued its ruling: "In these circumstances, where there is no evidence to show that the Employer bargained in bad faith or modified the bargaining agreement, the only dispute lies in how the pension plan should be interpreted. Inasmuch as the Board does not in these circumstances resolve such conflicts, I am refusing to issue a complaint in this matter. *United Telephone of the West,* 1955 WL 13197, 112 NLRB 779 (1955)."

Under Section 19:05 of the CBA, disputes relating to the Plan were not subject to any grievance procedures. Shortly after the NLRB's decision, the Union membership, on recommendation from its leaders, decided to engage attorney Matthew Glasson. The Union retained Glasson as counsel and filed suit in the Davenport Division of this Court on January 16, 1996 alleging, *inter alia;*

4. Plaintiff [the Union] is the certified bargaining representative for production and maintenance employees employed by [Titan].

5. [The Union and Titan] are parties to a series of collective bargaining agreements the most recent of which has the effective dates of July 13, 1993 through July 12, 1996.

6. Article XIX of said [CBA] contains a provision for a defined benefit pension plan. . . .

8. During the negotiations which led up to the current [CBA], the parties agreed to freeze the defined benefit pension plan and that agreement was incorporated in the collective bargaining agreement as Section 19.03(b) which provides that "The Defined Benefit Plan will be frozen with no loss of vested benefits as of July 12, 1993."

9. A dispute has arisen between the parties concerning the proper interpretation of Section 19.03(b).

10. Section 19.05 of [the CBA] provides that "No matter respecting the provision of these programs shall be subject to the grievance procedure."

11. The court has jurisdiction of this dispute pursuant to 29 U.S.C. § 185 and 29 U.S.C. § 1451.

WHEREFORE the [Union] requests that the court take jurisdiction over this dispute, review and interpret the disputed provision of the [CBA], issue appropriate declaratory and injunctive relief, and award the Plaintiff the costs of this action including its reasonable attorney fees.

*International Assoc. of Machinists and Aerospace Workers, Local Lodge 2048 v. Titan Wheel Int'l, Inc.,* 3–96–CV–10008 ("the '96 suit").

The purpose for filing the '96 suit is sharply contested by the parties. According to Plaintiffs, "the only mechanism available to the [Union] for *obtaining an authoritative interpretation of the disputed language* of Section 19:03 was a suit against Titan for breach of the collective bargaining agreement under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185." Pls.' Brief in Opp. at 4–5 (emphasis added); in other words, to Plaintiffs, this was a contract dispute between their Union and Titan. And, given that pension disputes were expressly excluded from the grievance procedures, the '96 suit was the "functional equivalent of a grievance under the [CBA]." Pls.' Brief in Opp. at 5. According to Defendants, however, the '96 suit brought by the

Union was meant not only to seek interpretation of the 1993 Freeze Amendment but also to request an award of benefits under the Plan. *See* Defs.' Reply to Pls.' Resistance to Defs.' Mot. for Summ.J. at 8.

During the pendency of the '96 suit, the Union and Titan reentered negotiations concerning the controversial freeze provision of the CBA. After a series of negotiations, both sides thought they reached a deal; the Union would withdraw its '96 suit in exchange for an increase in Titan's contribution to the Union-administered pension fund (from 10¢ to 25¢ per hour worked). Several meetings were held and Union members discussed the merits of the proposed deal. In July of 1996, the members voted down the proposal. Some time later in August of 1996, Union counsel Glasson expressed to Union local president Jerry Simms that prosecuting the '96 suit would be costly and time-consuming for the Union and its membership. Glasson urged the Union to accept the proposed deal. After a second vote in August of 1996, the membership finally accepted the proposed deal: the Union would dismiss its '96 suit with prejudice and Titan agreed to contribute 25¢ per hour to a separate Union-administered pension fund; additionally, as they had done in 1993, the Union and Titan agreed "[t]hat the Plan would remain frozen with no loss in vested benefits as of July 12, 1993." *See* 1996 Agreement, Article XIX, ¶ 19:03(b), (c) (hereinafter "1996 Freeze Amendment"). It is not disputed that Titan continues to contribute 25¢ per hour to a separate Union-administered pension fund pursuant to the 1996 Freeze Amendment.

In May of 1998, individual members of the Union filed the present suit against Titan and the Plan pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* Plaintiffs are older workers who voted against the 1996 Freeze Amendment. In the present action ("the '98 suit"), Plaintiffs seek to have the 1996 Freeze Amendment declared null and void on grounds that it violates "notice" requirements of ERISA section 204(h), 29 U.S.C. § 1054(h), and/or that it violates "anti-cutback" provisions of ERISA section 204(g), 29 U.S.C. § 1054(g). Additionally, Plaintiffs seek an award of benefits, credit for time served, and other appropriate relief.

Defendants Titan and the Plan argue in their Motion for Summary Judgment that the voluntary dismissal with prejudice of the '96 suit should be given preclusive effect of the current action, and that therefore the '98 suit is barred under principles of res judicata. Plaintiffs deny that the '98 suit is res judicata, and accordingly seek in their Motion for Summary Judgment a ruling on the merits of their ERISA claims. Admittedly this is a difficult case, and, as stated at the outset, raises important questions about the role and extent of Unions in the negotiation and bargaining of members' pension rights. For the following reasons, the Court denies the Defendants' Motion for Summary Judgment, grants Plaintiffs' Motion for Summary Judgment regarding the "notice" and "anti-cutback" provisions, and reserves ruling on Plaintiffs' request for an award of benefits pending a hearing on the proper determination of benefits.

## II. Summary judgment standard

The purpose of summary judgment is to "pierce the boilerplate of the pleading and assay the parties' proof in order to determine whether trial is actually required." 11 *Moore's Federal Practice* 3d, § 36.02 at 56–20 (Matthew Bender 3d ed.1997) (citing *Wynne v. Tufts Univ. School of Medicine,* 976 F.2d 791, 794 (1st Cir.1992), *cert. denied,* 507 U.S. 1030, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993)).

"The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Handeen v. Lemaire,* 112 F.3d 1339, 1345 (8th Cir.

1997) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Thus, summary judgment is properly granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(*o*); *Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir.1994). In a motion for summary judgement, the court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 253–54, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). An issue is "genuine," if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material." *Id.*

Even though Plaintiffs' Motion for Summary Judgment was filed first, the Court will address Defendants' Motion for Summary Judgment since a ruling on the res judicata issue is preliminary to a ruling on the merits.

### III. Discussion

#### A. Res Judicata

■ Parties do not dispute that federal principles of res judicata (also commonly referred to as "claim preclusion") govern the outcome of Defendant's instant Motion to Dismiss. Under federal principles, the doctrine of res judicata precludes a subsequent lawsuit when: "(1) the first suit resulted in a final judgment on the merits; (2) the first suit was based on proper jurisdiction; (3) both suits involved the same cause of action; and (4) both suits involved the same parties or their privies." *In re Anderberg–Lund Printing Co.,* 109 F.3d 1343, 1346 (citing *Lovell v. Mixon,* 719 F.2d 1373, 1376 (8th Cir.1983)). Furthermore, the party defending against a claim of res judicata (here the Plaintiffs)

must have had a "full and fair opportunity to litigate the matter in the proceeding that is to be given preclusive effect." *In re Anderberg–Lund,* 109 F.3d at 1346.

The Plaintiffs dispute that the third and fourth elements of the res judicata analysis are met. To the extent that Plaintiffs argue that the Union lacked standing in the '96 suit to raise ERISA claims, Plaintiffs appear also to contest the second element of the res judicata analysis as well, namely, that the '96 suit was based on proper jurisdiction. In short, all that Plaintiffs concede for purposes of Defendant's res judicata argument is that the dismissal of the '96 suit was a final judgment on the merits. *See Jaramillo v. Burkhart,* 59 F.3d 78, 79 (8th Cir.1995). Thus, the Court will address each of the remaining three elements of *Anderberg–Lund*'s res judicata analysis: proper jurisdiction, same causes of action, same parties (or privies).

■ Looking at the record in the light most favorable to Plaintiffs as the nonmoving party, the Court finds that the '96 suit was filed in a court of competent jurisdiction. On its face, the '96 suit sought interpretation of Section 19.05 of the CBA then in effect. Interpretation of contracts between an "employer and a labor organization representing employees in an industry affecting commerce" is plainly within the jurisdiction of the federal courts. *See, e.g., Bittinger v. Tecumseh Products Co.,* 123 F.3d 877, 882 (6th Cir. 1997); *International Union v. Acme Precision Products, Inc.,* 515 F.Supp. 537, 539 (E.D.Mich.1981). The Union's citation to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 in this context is appropriate. Thus, insofar as the '96 suit was a contract dispute between the Union and Titan (and from the face of the Complaint it clearly was), any court responding to a jurisdictional challenge on these grounds would find jurisdiction present.

■ The Union also erroneously premised jurisdiction under ERISA, 28 U.S.C. § 1451. By its terms, only "participant[s]," "beneficiar[ies]," fiduciar[ies]," and "the Secretary [of Labor]" are given standing to bring a civil action under ERISA, 29 U.S.C. § 1132(a). Unions or employee organizations do not appear in section 1132, and therefore lack standing to sue under the statute, *see New Jersey State AFL—CIO v. New Jersey*, 747 F.2d 891, 892 (3d Cir.1984); *McCabe v. Trombley*, 867 F.Supp. 120, 124–25 (N.D.N.Y. 1994); *International Union v. Auto Glass Employees Fed. Credit Union*, 858 F.Supp. 711, 721 (M.D.Tenn.1994), *aff'd by*, 72 F.3d 1243 (6th Cir.1996); *see also* Ronald J. Cooke, 2 *Erisa Practice and Procedure* § 87:6 at 8–37 n. 50 (2d 1996) (citing cases holding same); *but see International Assoc. of Bridge Structural and Ornamental Iron Workers Local No. 111 v. Douglas*, 646 F.2d 1211 (7th Cir.1981) (holding that Unions have standing under ERISA

to seek clarification of members' benefit rights),[2] a federal court would have lacked jurisdiction to hear the '96 suit premised solely on § 1451. In short, the '96 suit was correctly before the Court because the Union correctly asserted independent grounds for jurisdiction under the federal labor statute, namely 28 U.S.C. § 185.

■ Ordinarily, with respect to the "same claim" requirement, two cases are really the same 'claim' or 'cause of action' for purposes of res judicata "if a case arises out of the same nucleus of operative fact, or is based upon the same factual predicate, as a former action," *Ruple v. City of Vermillion*, 714 F.2d 860, 861 (8th Cir.1983); *see also Lane v. Peterson*, 899 F.2d 737, 742 (8th Cir.1990). However, when res judicata principles operate to impinge on federal statutory rights, the courts have expressed substantial willingness to safeguard federal claims even when the factual circumstances giving rise

2. The Seventh Circuit's holding in *Douglas* has not gone unnoticed. *See Northeast Dep't ILGWU Health and Welfare Fund v. Teamsters Local Union No. 229 Welfare Fund*, 764 F.2d 147, 152 (3d Cir.1985) (criticizing the *Douglas* Court for failing "to reconcile [its] result with the express words of the statutory provision—which do not include unions among the persons or entities that may bring suit"); Cooke at 8–38 ("[*Douglas* ] is difficult to reconcile with the express words of the statutory provisions, which do not include unions among the persons or entities that may commence a civil action for benefits, and there is nothing in the legislative history that would indicate that it was intended for unions to have this right.").

Although the Eighth Circuit has not yet had occasion to decide the question of Union standing under ERISA, it has made clear that it construes ERISA's statutory provisions according to their "plain language," *Prudential Ins. Co. of America v. Doe*, 76 F.3d 206, 209 (8th Cir.1996); *Rockney v. Blohorn*, 877 F.2d 637, 640–41 (8th Cir.1989), and there is no good reason to believe it wouldn't do the same on this issue. *Cf. Novak v. Andersen Corp.*, 962 F.2d 757, 760 (8th Cir.1992) (Richard Arnold, Circuit J.) ("Nor does § 502(a)(3) expressly say anything about the recovery of compensatory or punitive damages. Absent some specific indication by Congress that it intended to offer a form of relief not explicitly

provided for by the governing provisions, we cannot conclude that the statute itself affords Novak the relief he is requesting. And we find nothing in the statutory language to persuade us to interpret 'other appropriate equitable relief' to mean anything other than what it usually means—declaratory or injunctive relief."); *see also Pressroom Unions–Printers League Income Sec. Fund v. Continental Assurance Co.*, 700 F.2d 889, 892 (2d Cir.1983), *cert. denied*, 464 U.S. 845, 104 S.Ct. 148, 78 L.Ed.2d 138 (1983) (holding that civil standing list is exclusive).

Finally, the text of ERISA itself clearly reveals Congressional intent not to grant Unions or labor organizations standing to pursue claims on behalf of their members. In the notice provisions of ERISA section 204(h)(1), 29 U.S.C. § 1054(h)(1), Congress knew how to incorporate Unions into the statutory framework. Section 204(h)(1) requires that written notice of a plan amendment and its effective date be sent to: "(A) each participant in the plan, (B) each beneficiary ... and (C) *each employee organization* representing participants in the Plan,___" (emphasis added). Thus, the fact Congress knew how and when to incorporate Unions into the statutory scheme, coupled with the conspicuous absence of any mention of Unions in the civil enforcement provision, strongly suggest that Congress intended *not* to grant Unions standing to bring civil suits under ERISA.

to both actions are the same. Thus, when federal rights are directly implicated, the res judicata inquiry focuses on the nature of the claims being vindicated. Thus, in *American Federation of Television and Radio Artists Health and Retirement Funds v. WCCO Television, Inc.*, 934 F.2d 987 (8th Cir.1991), the Court, in deciding that a prior arbitration to enforce contributions to an employee benefit plan would not be given preclusive effect in an ERISA action under the same facts, observed: "Federal labor law policy favoring arbitration must yield to the competing policy that a 'member of the bargaining unit may bring a separate suit if his claim, although perhaps comprehended by the [CBA], is also based upon federal statutory rights separate from that agreement.'" *WCCO Television*, 934 F.2d at 990 (quoting "the well reasoned opinion" in *Moldovan v. Great Atl. & Pac. Tea. Co.*, 790 F.2d 894, 896 (3d Cir.1986), *cert. denied*, 485 U.S. 904, 108 S.Ct. 1074, 99 L.Ed.2d 233 (1988)). Similarly, in *Herendeen v. Champion Int'l Corp.*, 525 F.2d 130 (2d Cir.1975), the court found that a prior state court suit for breach of an oral agreement which led to lost pension benefits did not preclude subsequent federal diversity action for lost pension benefits. Concluding that plaintiff "has not yet had his day in court on the issue of whether he can sustain his claim to pension rights," *id.* at 135, the court held that "the present federal complaint alleges and sets forth a separate and distinct cause of action from that adjudicated in the state court." *Id.; see also Amaro v. Continental Can Co.*, 724 F.2d 747 (9th Cir.1984) (stating that "a factor to be considered in determining whether the same claim is involved is whether the two suits involve infringement of the same right") (citation omitted).

The notion that rights created by federal statute should take precedence over those created through the collective bargaining process is supported by a series of Supreme Court cases, all of which stressed the primacy of vindicating the federal right. In *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), the Court observed, for example, that "Title VII's purpose and procedures strongly suggest that an individual does not forfeit his private cause of action if he first pursues his grievance to final arbitration under ... a collective bargaining agreement. *** The distinctly separate nature of these contractual and statutory rights is not vitiated merely because both were violated as a result of the same factual occurrence." *Id.* at 49–50, 94 S.Ct. 1011. Addressing the importance of the Fair Labor Standards Act (FLSA), the Court in *Barrentine v. Arkansas–Best Freight System, Inc.*, 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981), wrote:

> FLSA rights petitioners seek to assert in this action are independent of the collective bargaining process. They devolve on petitioners as individual workers, not as members of a collective organization. They are not waivable. Because Congress intended to give individual employees the right to bring their minimum-wage claims under the FLSA in court, ... we hold that petitioners' claim is not barred by the prior submission of their grievances to the contractual dispute-resolution procedures.

*Id.* at 745, 101 S.Ct. 1437. Striking the same theme regarding the Americans with Disabilities Act (ADA), the Court in *Wright v. Universal Maritime Serv. Corp.*, 525 U.S. 70, 119 S.Ct. 391, 142 L.Ed.2d 361 (1998), stated: "The cause of action Wright asserts arises not out of contract, but out of the ADA, and is distinct from any right conferred by the collective-bargaining agreement." 525 U.S. 70, 119 S.Ct. at 396 (citation omitted).

In light of these principles, the Court finds that the '96 and '98 suits are not the same causes of action. In 1996, the Union urged the Court to "review and interpret the disputed provision of the [CBA]" and issue appropriate "declaratory and injunctive relief." Although such a

prayer for relief seems analogous to declaratory relief under ERISA section 502(a) to "clarify . . . rights to future benefits under the terms of the plan," in the Court's view and giving Plaintiffs all reasonable inferences, the Union, as the only party in that litigation, sought all it was legally entitled to: a declaration of rights created by the collective bargaining process. The Union could not have, as a matter of law, sought analogous relief under ERISA section 502(a) to "clarify" "rights to future benefits" as Unions lack standing to assert claims under ERISA in the first instance. *New Jersey State AFL—CIO*, 747 F.2d at 892. In the instant action, which is based on the same factual circumstances as the prior litigation, Plaintiffs intend to vindicate wholly separate federal rights under ERISA. And as the authorities above make clear, this is entirely permissible.

Titan also argues that the present action for an award of benefits under ERISA *could* have been brought in 1996 when the Union went to federal court. *County of Boyd v. U.S. Ecology, Inc.*, 858 F.Supp. 960, 968 (D.Neb.1994), *aff'd by*, 48 F.3d 359 (8th Cir.1995) ("Res judicata precludes the relitigation of a claim on grounds that were raised, or that could have been raised, in the prior action."). Titan's argument on this score presumes, of course, union standing under ERISA. That's a premise, as indicated earlier, the Court is unwilling to accept.

■ However, even assuming the existence of union standing under ERISA, the Defendants' assertion that the Union could have sought benefits in 1996 on behalf of its members is foreclosed by the well-settled rule that associations such as labor unions cannot proceed on behalf of their members when claims for monetary, as opposed to equitable or declaratory, relief are involved. In *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), a case involving an association of taxpayers suing a town for unconstitutional zoning ordinances, the Supreme Court expounded

at length on why associations can't sue for damages (as opposed to injunctive or declaratory relief) on behalf of its members:

> [W]hether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind. *E.g., National Motor Freight Ass'n v. United States*, 372 U.S. 246, 83 S.Ct. 688, 9 L.Ed.2d 709 (1963). *See Data Processing Service v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). *Cf.* Fed.Rule Civ.Proc. 23(b)(2).
>
> The present case, however, differs significantly as here an association seeks relief in damages for alleged injuries to its members. Home Builders alleges no monetary injury to itself, nor any assignment of the damages claims of its members. No award therefore can be made to the association as such. Moreover, in the circumstances of this case, *the damages claims are not common to the entire membership, nor shared by all in equal degree.* To the contrary, *whatever injury may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof.* Thus, to obtain relief in damages, each member of Home Builders who claims injury as a result of respondents' practices must be a party to the suit, and *Home Builders has no standing to claim damages on his behalf.*

*Warth*, 422 U.S. at 515–16, 95 S.Ct. 2197 (emphasis added). The rule in *Warth* that an association is not competent to claim monetary relief on behalf of its members

is a firmly established principle in federal standing jurisprudence. *See United Union of Roofers, Waterproofers, and Allied Trades No. 40 v. Insurance Corp. of America,* 919 F.2d 1398, 1400 (9th Cir. 1990) ("no federal court has allowed an association standing to seek monetary relief on behalf of its members"); *Telecommunications Research & Action Center v. Allnet Communication Services, Inc.,* 806 F.2d 1093, 1095 (D.C.Cir.1986) (same proposition and citing cases); *International Woodworkers of America, AFL—CIO, CLC v. Georgia–Pacific Corp.,* 568 F.2d 64, 66 (8th Cir.1977) ("Absent the assignment of the damages claims of its members or the allegation of monetary injury to itself, an association may only seek injunctive or declaratory relief ...)" (citing *Warth v. Seldin,* 422 U.S. 490, 515–16, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)); *Local 194, Retail, Wholesale and Dep't Store Union v. Standard Brands, Inc.,* 540 F.2d 864, 865 (7th Cir.1976) ("When damages claims are not common to the entire membership, nor shared by all in equal degree, but are peculiar to the individual member concerned, each member who claims damages must be a party to the suit, and the organization lacks standing to claim damages on his behalf.") (internal citation and quotations omitted); *cf. Associated General Contractors v. Otter Tail Power Co.,* 611 F.2d 684, 690 (8th Cir.1979) (associations only have standing to seek injunctive and not monetary relief under the Clayton Act).

In sum, even though both actions were inspired in large part by Titan's denial of benefits to Mr. Carlton in 1995, the Court finds that the '96 and '98 lawsuits are not the "same causes of action" for purposes of the res judicata analysis. In the first action, the Union sought all that it legally could: an interpretation of the CBA favorable to its members regarding the meaning of the 1996 Freeze Amendment; in the present case, Plaintiffs seek, among other things, recognition of current and future pension rights and an award of benefits pursuant to the enforcement provisions of ERISA section 502.

Even assuming the two cases constitute the "same causes of action," Plaintiffs would still not be precluded from bringing the present action as there is absent the necessary congruence or "privity" between them and the Union.

■ Because individually named Plaintiffs were not parties in the first lawsuit, the Court must analyze the "same party" requirement with reference to a "privity" relationship. *See Richards v. Jefferson County, Alabama,* 517 U.S. 793, 798, 116 S.Ct. 1761, 135 L.Ed.2d 76 (1996); *Tyus v. Schoemehl,* 93 F.3d 449, 454 (8th Cir.1996). The law recognizes three categories of nonparties who will be considered in privity with a party to the prior action and who will be bound by a prior adjudication: (1) a party who controls the original action; (2) a successor-in-interest to a prior party; and (3) a nonparty whose interests were adequately represented by a party to the original action. *Tyus,* 93 F.3d at 454 (citing 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* §§ 4451, 4454–57, 62 (1981 & Supp.1990)). The privity analysis in this case turns on the third category: adequate representation, or as the *Tyus* Court termed it, "virtual representation."

Citing *Aerojet–General Corp. v. Askew,* 511 F.2d 710, 719 (5th Cir.1975), *cert. denied,* 423 U.S. 908, 96 S.Ct. 210, 46 L.Ed.2d 137 (1975), the *Tyus* Court explained virtual representation in the following way: "Under the federal law of res judicata, a person may be bound by a judgment even though not a party if one of the parties to the suit is *so closely aligned with his interests* as to be his virtual representative," *Tyus,* 93 F.3d at 454 (emphasis added). "Due to the equitable and fact-intensive nature of virtual representation, there is no clear test for determining the applicability of the doctrine," though the *Tyus* Court announced at least seven "guiding principles." *Id.* at 455. These "guiding principles" include: (1) identity of interests between the two parties; (2)

close relationship between the prior and present parties; (3) participation in the prior litigation; (4) apparent acquiescence; (5) whether the present party deliberately maneuvered to avoid the effects of the first action; (6) adequacy of representation, which is best viewed in terms of incentive to litigate; (7) and the nature of the issue raised, meaning whether a public law issue or private law issue is implicated. *Id.* at 455–56 (citations and quotations omitted). In the final analysis, a "nonparty will be barred from bringing his claim only when the balance of equities tips in favor of preclusion." *Id.* at 454 (citing *Gonzalez v. Banco Cent. Corp.,* 27 F.3d 751, 761 (1st Cir.1994)) (internal quotations omitted).

■ In the present case, after considering *Tyus'* guiding principles and viewing the record in the light most favorable to Plaintiffs, the balance of equities tips decidedly against a finding of privity between Plaintiffs and the Union. With respect to the "identity of interests" and "close relationship" between the Union and Plaintiffs, it is true that the Union and Plaintiffs both shared in the overall goal of obtaining favorable concessions from the company. But the identity of interests stops there and very quickly, as evidenced by this record, interests diverge. From the Union's vantage point, the question becomes "What's in the best interests of all members?" From the individual's point of view, the central concern is "What's in *my* best interest?" Majority rule underscores the tension. If, as Plaintiffs contend, the majority in the bargaining unit were younger workers, they would have less interest in protecting the vested pension benefits that would very soon flow to a smaller, yet significantly older, group of workers. For example, in Mr. Carlton's case, absent the

Union-negotiated deal involving the 1996 Freeze Amendment, his pension benefit would have begun to issue in 1995 when he sought retirement. Unfortunately for him and others, the vote went the other way. Because that vote materially affected individual federal pension rights, common sense and fundamental fairness concerns suggest that Union action should not be the last word on the subject.

Trade-offs like this reflect a traditionally dynamic inherent in the give-and take of collective bargaining. "National labor policy," wrote the Supreme Court in 1967,

has been built on the premise that by pooling their economic strength and acting through a labor organization freely chosen by the majority, the employees of an appropriate unit have the most effective means of bargaining for improvements in wages, hours, and working conditions. The policy therefore extinguishes the individual employee's power to order his own relations with his employer and creates a power vested in the chosen representative to act in the interests of all employees.

*NLRB v. Allis–Chalmers Manufacturing Co.,* 388 U.S. 175, 180, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967). However, the power of the "chosen representative" to order employee relations is not absolute. There are limits to what Unions can and cannot do in its capacity as bargaining representative.[3]

Although the line between permissible and impermissible union action may sometimes be hard to discern, the Court is convinced that serious due process concerns are raised when, as here, a Union, acting in its capacity as exclusive bargaining representative, purports also to act as the collective legal representative of a

---

3. *See* Richard Wallace, *Union Waiver of Public Employees' Due Process Rights.* 8 Indus.Rel.L.J. 583, 597 (1986) (listing several worker rights which unions are barred from waiving, including employee right to distribute union literature or to solicit union support in nonworking areas on nonworking time, *NLRB v. Magnavox Co.,* 415 U.S. 322, 94 S.Ct. 1099, 39 L.Ed.2d 358 (1974); employee right against race discrimination, *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); employee right to strike against unfair labor practices, *Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956)).

group of individuals and foregoes important federal rights. The Court in *Barrentine,* while addressing the context of Union representation of FLSA rights, spoke to the same representational concerns at issue here:

> Since a union's objective is to maximize overall compensation of its members, not to ensure that each employee receives the best compensation deal available [citation omitted], a union balancing individual and collective interests might validly permit some employees' statutorily granted wage and hour benefits to be sacrificed if an alternative expenditure of resources would result in increased benefits for workers in the bargaining whole.

*Barrentine,* 450 U.S. at 742, 101 S.Ct. 1437; *see also International Union v. Brock,* 477 U.S. 274, 289, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986) (Powell, J., dissenting) (similarly noting that because members may have different stakes in the outcome of a lawsuit, the "theoretical identity between the organization and its members ... disappears"). Put simply, it cannot be said that just because a Union is charged with negotiating better terms and conditions of employment on behalf of its workers that it also can adequately represent its members when it comes to protecting federal rights such as entitlements to retirement benefits. The Union, acting in good faith and probably in accordance with its duty of fair representation,[4] elected to forego the prosecution of certain rights which many members wanted vindicated; on this set of facts, it simply cannot be said that the Union adequately represented the Plaintiffs' rights. *Brock,* 477 U.S. at 290, 106 S.Ct. 2523 (where an association does not adequately represent its members and

a judgment is won against it, due process might permit subsequent claims by the association's members).

The Court has considered the remaining *Tyus* "guiding principles" and concludes that the balance of equities tips against a finding of preclusion. *Tyus,* 93 F.3d at 454. For the foregoing reasons, the dismissal with prejudice of '96 lawsuit is not preclusive of the instant claim. Therefore, Defendants' Motion for Summary Judgment on their res judicata theory is denied.

### B. Plaintiffs' Motion for Summary Judgment

Having concluded that genuine issues of material fact exist that Plaintiffs are not barred by res judicata principles from bringing the present action, the Court turns now to Plaintiffs' Motion for Summary Judgment on the merits of their claims. First, Plaintiffs argue that no genuine issue of material fact exists as to Count I of their Complaint; namely, that Defendants improperly froze benefit accruals under the Plan as of July 12, 1993 in that the Plan has never been effectively amended to effectuate such a freeze because Defendants failed to comply with the notice procedures mandated by section 204(h) of ERISA, 29 U.S.C. § 1054(h). Second, Plaintiffs argue in Count II that even if benefit accruals were properly frozen as of July 12, 1993, Defendants have nonetheless violated section 204(g) of ERISA, 29 U.S.C. § 1054(g), by refusing to count the post-July 12, 1993 service of participating employees for purposes of permitting them to qualify for certain subsidized early retirement benefits and retirement-type subsidies under the Plan.

---

4. *See Barrentine,* 450 U.S. at 742 n. 20, 101 S.Ct. 1437 (citing *Humphrey v. Moore,* 375 U.S. 335, 349, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964)) ("[W]e are not ready to find a breach of the collective bargaining agent's duty of fair representation in taking a good faith position contrary to that of some individuals whom it represents nor in supporting the

position of one group of employees against that of another.") (citation omitted); *see also Sutton v. Weirton Steel Division of Nat'l Steel Corp.,* 724 F.2d 406, 412 (4th Cir.1983) (union did not breach its duty of fair representation by agreeing to terms of sale affecting some of its members' contingent benefits).

### 1. Section 204(h) allegations

By statute, the Plan in effect at the Walcott Plant "may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless":

> after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date, to—(A) each participant in the plan, (B) each beneficiary . . ., and (C) each employee organization representing participants in the plan, . . . .

29 U.S.C. § 1054(h)(1). Plaintiffs argue that section 204(h)'s notice provision was violated because notice of the plan amendment, assuming such an amendment oven exists, was not sent to "each participant in the plan" 15 days prior to the effective date of the amendment.[5]

The gist of Plaintiffs' section 204(h) argument seems to be that while Titan may have had valid and good intentions to amend the company's pension plan, it went about the process all wrong. Perhaps the clearest expression of what was required of Titan to validly amend the Plan came from Titan's own actuary who, in a letter dated September 10, 1993, and addressed to Titan's Controller, listed the five steps which Titan needed to take in order to satisfy ERISA's requirements for implementing the freeze accruals. Significantly, the actuary made his recommendations with the knowledge that Union membership, by majority vote taken on July 12, 1993, had already approved a proposal to freeze benefits. Still, the actuary recommended to Titan the following action:

1. Issue a notice to all participants and beneficiaries that benefits and participants in the plan *will be* frozen. *This must be done 15 days prior to the freeze date.*
2. Draft and adopt a Board Resolution to have the pension plan frozen for both benefit accruals and new entrants.
3. Amend the plan for this freeze . . .
4. Issue a "Summary of Material Modification" to all participants and file with the DOL within 210 days after the Board Resolution to freeze benefits . . .
5. Ultimately, you will need to rewrite the Summary Plan Description (Benefits Booklet).

Pls.' Br. In Support of Pls.' Mot. for Sum.J. at 5 n. 4 (emphasis in brief).

█ Plaintiffs' central complaint is simply that Titan failed to act on any of these recommendations, most fundamentally, the requirement that notice be sent from the company to each participant 15 days prior to the freeze date. Titan concedes that it did not send individual notices as required by the letter of section 204(h). However, they argue that the "spirit" of the notice provision is met in this case because the Union members were either constructively (by virtue of the Union's 1993 negotiations concerning the freeze proposal) or actually (to the extent members individually participated in and educated themselves about the proposal to freeze benefits) put on notice. Defendants do not cite any statutory or case law authority for the proposition that actual or constructive notice to members prior to the date a plan amendment takes effect is sufficient notice for section 204(h).

That's an appealing proposition but it glosses over the specificity and detail of

---

5. Plaintiffs' Complaint also alleges that Defendants violated ERISA's reporting and disclosure requirements, as set forth in sections 102(a), 104(a)(1), and 104(b)(1), 29 U.S.C. §§ 1022(a), 1024(a)(1), and 1024(b)(1). These provisions require Defendants to file material changes to the Plan with the United States Secretary of Labor within 210 days after the end of the plan year in which the change was adopted, and to notify participants of the change within 60 days. Although alleged in their Complaint, Plaintiffs did not directly address these post-amendment notice requirements in their briefs. Instead their arguments take aim at the pre-amendment notice requirements of section 204(h). Therefore, the Court's man focus is on the section 204(h) allegations.

ERISA's notice provision altogether. Defendants' argument seems to assume that the "notice" required by section 204(h) is simply a generic requirement to notify participants in some fashion that changes in plan benefits are afoot. Congress, however, did not mince words in the law. ERISA expressly requires that the "written" notice—which must "set[ ] forth the plan amendment and its effective date"— be sent from the "plan administrator" "to each" participant "after adoption of the plan amendment" and "not less than 15 days" before the amendment's effective date. Congress said nothing about excepting notice which otherwise conforms to the "spirit" of the law. In fact, Congressional findings offer strong evidence that nothing less than strict compliance with the detailed, but straightforward, notice requirements would be acceptable. *See* section 2 of ERISA, 29 U.S.C. § 1001 ("[O]wing to the lack of employee information and adequate safeguards concerning their operation, it is desirable in the interest of employees and their beneficiaries, ... that disclosure be made and safeguards be provided with respect to the establishment, operation, and administration of such plans...."); *See also Production and Maintenance Employees' Local 504 v. Roadmaster Corp.*, 954 F.2d 1397, 1406 (7th Cir.1992) (rejecting notice that did not comply with the letter of section 204(h)'s notice requirements).

 The fact of the matter is—and the record is pretty clear on this score—Titan simply failed to follow the steps necessary for amending its pension plan in a way that conforms with section 204(h) of ERISA. The form of the notice was not met; the content of the notice was not met; the timing of the notice was not met; the authorship of the notice was not met. On this last point, the only official statement coming from the Plan administrator (Titan) is a photocopy of minutes taken from a November 1, 1998 meeting of Titan's Board of Directors which announces that "the [Plan] is hereby amended to be frozen as of July 12, 1993 with no loss in vested benefits, not [sic] additional accrual of service credit and no new entrants as of that date." Assuming this statement from the Board of Directors constitutes the "written notice" from the "plan administrator" setting forth the "plan amendment and its effective date," then the notice is still defective because it was not sent to "each" plan participant "15 days before the effective day of the plan amendment." 29 U.S.C. § 1054(h)(1). Titan does not even contest Plaintiffs' assertion that Titan failed to provide the Department of Labor with, among other things, a summary of these changes, an action required by section 104(a) of ERISA. For the reasons cited, the Court finds that no genuine issue of material fact exists on the question of valid notice under section 204(h) of ERISA. The notice of amendment that the Plan administrator (here Titan) gave to "each participant" was ineffective, and therefore invalid, as a matter of law. The Court grants Plaintiffs' Motion for Summary Judgment as to Count I of their Complaint.

### 2. Section 204(g) allegations

Plaintiffs' gripe with Defendants does not stop with defective notice. Abel and his fellow employees allege in Count II of their Complaint that Defendants have violated a substantive provision of ERISA. Specifically, in their Motion for Summary Judgment, they seek a ruling that Titan and the Plan violated section 204(g) of ERISA, 29 U.S.C. § 1054(g) (also known as the anti-cut back provision) by depriving employees of the ability to "grow into" eligibility for subsidized early retirement benefits and/or retirement type subsidies.

 Section 204(g) of ERISA, 29 U.S.C. § 1054(g), provides in relevant part:

(1) The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan....

(2) For purposes of paragraph (1), a plan amendment which has the effect of—

(A) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in regulations), or

(B) eliminating an option form of benefit,

with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits. In the case of a retirement-type subsidy, the preceding sentence shall apply only with respect to a participant who satisfies (either before or after the amendment) the preamendment conditions for the subsidy. \*\*\*

The Eighth Circuit has written this about section 204(g):

Under section 204(g), a plan sponsor may not decrease a benefit subsidy through a plan amendment when the participant has satisfied the preamendment requirements for the subsidy at the time of the amendment *or would otherwise be able to satisfy such requirements following the amendment.* Thus, section 204(g) extends to all participants the right to "grow into" a benefit subsidy by satisfying the plan's preamendment eligibility requirements following the amendment to the plan.

*Hunger v. AB*, 12 F.3d 118, 120 (8th Cir. 1993) (emphasis added). Plaintiffs contend, and the Defendants do not dispute, that Defendants interpret the 1993 and 1996 Freeze Amendment to mean that service after July 12, 1993 cannot count as part of an employee's credited service for purposes of determining 30–and–out pensions as well as benefits under the 85–points pension.[6] Plaintiffs also contend, and Defendants do not dispute, that under the freeze amendment as Titan interprets it,

employee service after July 12, 1993 cannot be counted in determining any of the supplemental benefits. If this is true, the freeze amendment would mean that employees who were Plan participants prior to July 12, 1993 would not be permitted to satisfy (or "grow into") the requirements of either the 30–and–out or 85–points pension plans, or any of the corresponding supplemental provisions. That on its face is a clear-cut violation of section 204(g). *See, e.g., Ahng v. Allsteel, Inc.,* 96 F.3d 1033, 1036 (7th Cir.1996) ("The courts of appeals that have ruled on an employee's right to "grow into" early retirement benefits have . . . uniformly held that as long as an employee satisfies, or will be able to satisfy, the eligibility requirements of the early retirement benefit in effect prior to the amendment, § 204(g) protects the benefit").

Defendants offer no response to Plaintiffs' contentions on the merits of the alleged section 204(g) violations. Rather, Defendants reprise arguments concerning res judicata and offer the additional remark that "all new employees hired after July 12, 1993 have always known the IAM Plan is the sole plan contributed to on their behalf." Resistance to Pls.' Mot. for Summ.J. at 8. New employees hired after July 12, 1993, Defendants add, "can have no reasonable expectation of receiving benefits under the Plan at issue here." *Id.*

It's apparent from the record and briefs filed by Defendants that there has not been any real effort to defend against the section 204(g) allegations, or to otherwise explain how the freeze amendment of 1993 or 1996 conforms with ERISA. Throughout this most recent litigation, the core of their defense has been preclusion, which they argued well, though unsuccessfully. Their efforts notwithstanding, the language of section 204(g) is "clear and im-

---

**6.** Under the 85–points plan, an employee, who having reached age 55 but not age 60 and whose combined age plus years of service equal at least 85, may qualify for an early retirement benefit under the Plan. *See* Article

II, section 2(a)(2) of the Plan. Employees who retire early under the 85–points plan may qualify for supplemental monies until the age of 62. *See* Article II, section 7(a)(2) of the Plan.

perative." *Roadmaster*, 954 F.2d at 1404. "Absent compliance with § 204(g), an amendment that decreases accrued benefits ... is ineffective." *Id.* (citing *Collins v. Seafarers Pension Trust*, 846 F.2d 936, 938–941 (4th Cir.1988)). Given the clarity of the law combined with the absence of any genuine issue of material fact, the Court is compelled to grant Plaintiffs' Motion for Summary Judgment as to the section 204(g) violations.

### 3. Relief

The Court begins by noting that Plaintiffs' counsel conceded at the hearing of January 26 that while discovery had been done with respect to relief requested, he was unable to specify the appropriate relief he believed Plaintiffs were entitled to. The Court therefore is not prepared to make any specific determinations about monetary relief that may be owed either to categories of Plaintiffs or individual Plaintiffs. The Court reserves ruling on damages or benefits that may be owed to Plaintiffs, pursuant to 29 U.S.C. § 1132, pending a hearing on this question.

Given that the 1993 and 1996 amendments purporting to freeze benefits as of July 12, 1993 are invalid, the Court orders that the Plan continue in force as if it had not been amended at all. *Roadmaster*, 954 F.2d at 1404. This means that Titan should make contributions to the Plan as the Plan existed prior to July 12, 1993 and cease contributing to the separate, Union-administered pension plan (the so-called IAM Plan).

Finally, until Titan properly amends the Plan consistent with the strictures of ERISA, the Court orders that all Plaintiffs be credited with their years of service subsequent to July 12, 1993 so that such Plaintiffs can properly satisfy (and "grow into") the requirements of either the 30-and-out or the 85-points plan (and any corresponding supplemental benefit provisions).

### IV. Conclusion

To summarize, the Court orders the following:

(1) Defendants' Motion for Summary Judgment as to res judicata is denied;

(2) Plaintiffs' Motion for Summary Judgment as to the section 204(h) claim (Count I) and section 204(g) claim (Count II) is **granted;**

(3) the Court incorporates the above-section entitled "Relief" into this Conclusion and sets a hearing for the determination of damages, past due benefits, and attorney's fees for February 22, 2000 at 4:00 p.m. at the U.S. Courthouse in Davenport, Iowa.

IT IS SO ORDERED.