AMALGAMATED LOCAL 2327 UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA LOCAL 2327, Plaintiff,

v.

TRI–COUNTY COMMUNITY ACTION AGENCY, INC., Defendant.

CIVIL ACTION NO. 02–2751 (JEI).

United States District Court,
D. New Jersey.

Sept. 3, 2002.

Cleary & Josem, by Regina C. Hertzig, Esq., Northfield, NJ, for Plaintiff.

Capehart & Scatchard, P.A., by Bruce L. Harrison, Esq., Mount Laurel, NJ, for Defendant.

## OPINION

IRENAS, District Judge.

The action before this court involves a motion to compel arbitration filed by Amalgamated Local 2327 United Automobile, Aerospace, and Agricultural Implement Workers of America (hereinafter "Local 2327") against Tri–County Community Action Agency, Inc. (hereinafter "Tri–County"). Local 2327 represents employees of Tri–County's Head Start program and wishes to arbitrate its dispute with Tri–County over the distribution of Quality Improvement funding awarded by the United States Department of Health and Human Services (hereinafter "HHS"). Local 2327 also seeks a preliminary injunction prohibiting Tri–County from dispersing any Quality Improvement funding pending the arbitrator's decision. For the reasons set forth below, the Court will deny Local 2327's application to enjoin Tri–County from distributing Quality Improvement funding pending arbitration. The Court will, however, direct Tri–County to distribute its Quality Improvement funds as detailed in this opinion and will direct Local 2327 and Tri–County to resume negotiations and possibly arbitrate any disputes regarding the relative distribution of the funds among the various Head Start teachers employed by Tri–County and represented by Local 2327.

Because there are no further disputes to be adjudicated by this Court, the order issued pursuant to this opinion shall be a final judgment. The Court will retain jurisdiction for the purpose of enforcing its order.

I.

Local 2327 and Tri–County are parties to two collective bargaining agreements covering professional and non-professional employees effective from January 22, 2000 through January 21, 2004. These agreements cover employees of Tri–County's Head Start program. (Am. Compl. ¶ 4; Am. Compl. Ex. A.) This dispute involves the distribution of Quality Improvement funding by HHS. HHS typically distributes this funding once per year. (Mosley Aff. ¶ 4.)

On April 9, 2002 HHS issued a "guidance" letter to Tri–County (as well as to other Head Start grantees nationwide) indicating total Quality Improvement funding for 2002 and detailing the responsibilities of grantees with respect to their shares of the increased funding. This letter is designed to provide general guidelines to Head Start administrators regarding the use of the funds. (Mosley Aff. ¶ 6; Mosley Aff. Ex. A.) On April 23, 2002 Tri–County received its specific grant letter from HHS, with Quality Improvement funding of $48,182 directed towards enhancing the salaries and fringe benefits of Head Start teachers. (Mosley Aff. ¶ 7; Mosley Aff. Ex. B.) Tri–County submitted its budget proposal to HHS on June 6, 2002 and this budget was approved in July of 2002. (Mosley Aff. ¶ 8; Letter from Harrison to Court of 7/26/02.) As of this date, HHS has yet to make an actual dispersal of the funds to Tri–County.

Article XI, Section E of both collective bargaining agreements reads:

[i]t is agreed that future Quality Improvement funding will be utilized for the purpose of wage and benefit improvements for the members of the UAW Local 2327 bargaining unit. The Employer will advise the Union of the amount of the Employer's allocation of Quality Improvement funding within 30 days of receipt of same. At that time, the parties will meet to negotiate the amount of the distribution of the funding to be utilized on behalf of the bargaining unit. If a dispute arises regarding the distribution of funds, the parties agree to mutually select an impartial arbitrator to resolve the dispute. As such, the parties agree to accelerate the aforementioned arbitrator selection process within 30 days of the request of either party.

(Am.Compl.Ex.A.) While there was a process of negotiations between the union and Tri–County, the parties were unable to come to an agreement regarding the distribution of the funds. The budget submitted to HHS by Tri–County included deductions of 19.5% from the total funding for Head Start teacher salary and benefit improvements for the costs of salaries and vacation, holiday and sick pay for personnel not directly affiliated with Head Start. (Kelly Aff. Ex. C.) These costs are considered indirect costs of running the Head Start program. Tri–County claims that this specific percentage is set by agreement between the agency and HHS and cannot be modified. (Def.['s] Br. at 4.) In addition to these indirect costs, Tri–County also deducted 27% for fringe benefits of the Head Start payroll.[1] (Am. Compl.Ex.D.) Total increased funding towards Head Start teacher salaries result-

1. According to Tri–County this 27% breaks down into 13% for payroll taxes, 10% for medical benefits, 2% for dental benefits, and 2% towards pensions. (Am.Compl.Ex.D.)

ing from the Quality Improvement funding, according to Tri–County and based on the method described above, equaled $25,777.[2] (Am.Compl.Ex.D.) Local 2327 also disputes a deduction of $3,000 towards dental expenses for Head Start children. (Am.Compl.¶ 9.) However, according to the evidence submitted, this deduction has not been made from Quality Improvement funding dedicated towards enhancing the salaries and benefits of Head Start teachers and has not been deducted from the funding of $48,182 which is in dispute here.[3] (Am.Compl.Ex.D.) Therefore, the $3,000 dedicated towards dental expenses is not at issue in this dispute. The funds remaining (the $25,777) were then distributed as salary increases for twelve Head Start teachers, while thirty eight additional Head Start teachers received no salary increase under the Tri–County budget proposal. Tri–County's method for determining which teachers would receive the funding applied towards their salaries was to give the funding to those Head Start teachers who have at least a two year degree in early childhood development and who do not teach in one of the Abbott school districts.[4]

Local 2327 alleges that the proper procedure for determining the distribution of the Quality Improvement funding was not met and that under the terms of its collective bargaining agreements with Tri–County it is entitled to arbitration regarding this distribution. Tri–County responds that it attempted to negotiate with the union but that, due to HHS restrictions, it had almost no discretion as to how to spend the funds. Therefore, Tri–County claims that any changes in the distribution as a result of arbitration may lead to a loss of the Quality Improvement funding from HHS.

## II.

In general, there is a presumption in favor of upholding arbitration clauses in collective bargaining agreements. *See United Steelworkers of America v. American Manufacturing Co.,* 363 U.S. 564, 567–68, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Enterprise Wheel and Car Corp.,* 363 U.S. 593, 599, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *United Steelworkers of America v. Warrior and Gulf Navigation Co.,* 363 U.S. 574, 582–83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). "This presumption of arbitrability for labor disputes recognizes the greater institutional competence of arbitrators in interpreting collective-bargaining agreements." *AT & T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). The correct analysis regarding the applicability of an arbitration clause is to look at three issues: "(1) [d]oes the present dispute come within the scope of the arbitration clause? (2) does any other provision of the contract expressly exclude this kind of dispute from arbitration? and (3) is there any other 'forceful evidence' indicating that the par-

---

2. The letter dated May 3, 2002 from Cynthia Wilks Mosley of Tri–County to Tom Austin of Local 2327 is not completely clear on what exact indirect cost rate is being used. However, the conclusion to the letter states that $25,777 will be directed towards Head Start teachers and this figure does equal the amount that should be distributed with a 27% fringe rate and a 19.5% indirect cost rate. (Am.Compl.Ex.D.)

3. Again, the letter dated May 3, 2002 from Cynthia Wilks–Mosley to Tom Austin states that $25,777 will be directed towards Head Start teachers. Since this figure corresponds with deductions only for fringe and indirect costs Tri–County is obviously deducting the dental money from other sources of funding. (Am.Compl.Ex.D.)

4. Teachers in the Abbott districts have already received significant raises through another source.

ties intended such an exclusion?" *E.M. Diagnostic Systems, Inc. v. Local 169, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America,* 812 F.2d 91, 95 (3rd Cir.1987).

 When a labor dispute involves issues not resolvable under the language of the relevant collective bargaining agreement, however, it is not appropriate for an arbitrator to be appointed. It is clear that an arbitrator "has authority to resolve only questions of contractual rights." *Alexander v. Gardner–Denver,* 415 U.S. 36, 53–54, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). Within the context of arbitration and labor disputes, arbitrators are helpful in interpreting contractual provisions and in understanding the law of the shop. However, it is not appropriate to leave to arbitration issues of law. As noted in *Barrentine v. Arkansas–Best Freight System, Inc.,* 450 U.S. 728, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981), "different considerations apply where the employer's claim is based on rights arising out of a statute." *Id.* at 737, 101 S.Ct. 1437. It is clear that when an arbitration award violates the law that award can be vacated. *Ludwig Honold Mfg. Co. v. Fletcher,* 405 F.2d 1123, 1128 (3rd Cir.1969). This principle applies whenever the issue to be arbitrated exceeds the scope of the collective bargaining agreement. Labor arbitrators have specific skills that are not easily transferable to issues that go beyond the actual collective bargaining agreement they are attempting to interpret.

### III.

#### A.

 The first issue involved in this matter is Tri–County's deduction of 19.5% off the top of the Quality Improvement funding for indirect costs. This issue is clearly beyond the scope of arbitration and therefore not arbitrable under *E.M. Diagnostic Systems, Inc.,* 812 F.2d at 95.

In order to run its operations Tri–County has no choice but to take a percentage of money of any grants it receives. This is the primary method by which it pays for its operations supporting Head Start and, presumably, other programs it administers. Without the ability to use grant money for indirect costs Tri–County would be unable to operate any specific government or privately funded programs. There is also no dispute among the parties that, at the very least, HHS approves of this method of paying for indirect costs.[5]

There is also no dispute that in the past Tri–County has used the same practice with regard to indirect costs with no objections from Local 2327. This seems to be a reasonable and appropriate method of funding the general operations of the agency. There is simply no role for an arbitrator here in determining the proper percentage of funding to be used for indirect costs. Accordingly, it is beyond the scope of any arbitration. Tri–County has determined what it believes is the proper percentage and HHS has agreed with this percentage. An arbitrator will not be in any better position to determine the correct percentage. There is no provision in the collective bargaining agreements that an arbitrator can use in determining what is a more appropriate amount. Under the proper standard of determining whether arbitration is appropriate, as detailed in

---

5. Tri–County states that the 19.5% figure is an absolute requirement from HHS while Local 2327 argues that there is no legal requirement that Tri–County deduct this percentage. (Def.['s] Br. at 4; Pl.['s] Br. at 9.) In either case, it is clear that HHS approves of the practice of using a percentage of the Quality Improvement funding for the purpose of paying for indirect costs and that the figure of 19.5% is not considered excessive.

*E.M. Diagnostic Systems, Inc.*, this portion of the dispute cannot come under the arbitration clause. 812 F.2d at 95. There is simply nothing for the arbitrator to arbitrate under the collective bargaining agreements as they give no guidance as to the appropriate level of deductions for indirect costs. As such, the issue of indirect costs is not suited for arbitration and the determination of Tri–County as to the amount of 19.5% must be upheld.

### B.

■ As with indirect costs, there is no authority within the collective bargaining agreements for an arbitrator to decide the issue of the proper deduction for fringe benefits. There can be no question that Tri–County must also spend portions of funding it receives on fringe benefits for its employees. The same logic which applies to indirect costs applies to fringe benefits as well. The level set by Tri–County has not been rejected by HHS as too costly, and the arbitration clause in question does not cover the amount of fringe benefit costs to be taken out of Quality Improvement funding.

■ More conclusively, with regard to the fringe benefits, the second requirement in the test for arbitrability spelled out in *E.M. Diagnostic Systems, Inc.* is implicated here. Specifically, there is a provision in the collective bargaining agreements excluding disagreements over fringe benefits from arbitration. 812 F.2d at 95. Article XIX, Section G of the collective bargaining agreements states that regardless of any other provision in the agreements, "[a]ny matter involving the administration, interpretation, or application of any insurance plans or any other fringe benefits" is not arbitrable. (Am. Compl.Ex.A.) The language here clearly excludes Tri–County's decisions regarding fringe benefits from arbitration.

■ Tri–County has, however, improperly calculated the level of deductions for fringe benefits in its budget proposal to HHS. It is not proper for Tri–County to deduct 27% from the total amount of Quality Improvement funding received from HHS. In the memo sent to counsel for Local 2327 and written by Linda Fiori from Tri–County, it is clear that the percentages for fringe benefits are supposed to be an average over the entire Head Start payroll. (Am.Compl.Ex.D.) Yet as has been shown above, portions of the Quality Improvement funding are not going to Head Start salaries, but are instead being distributed as indirect costs. Therefore, any percentage reduction for fringe benefits must be deducted only from that portion of the funding which is going towards Head Start payroll.

In addition, Tri–County is improperly deducting 10% for medical expenses and 2% for dental expenses. Under the collective bargaining agreements, these are clearly expenses which will not increase for Tri–County as the Quality Improvement funding increases. Article XIV of the collective bargaining agreements states that Tri–County has no obligation to increase its contributions towards its employees' medical and dental plans over the course of the agreements. The employees themselves are responsible for any increase in these costs. (Am.Compl.Ex.A.) Tri–County will not see any increase in its expenses for medical and dental coverage with the Quality Improvement funding. As a result, it is improper for Tri–County to deduct these percentages from the total amount of funding. It is likely that the other two components of the fringe benefit costs (payroll taxes and pension costs) will increase, and so therefore it is still appropriate for these amounts to be deducted. In conclusion, Tri–County should be deducting 15% for payroll taxes and pensions

from the amount it spends on salaries for Head Start teachers rather than 27% off of the total amount of Quality Improvement funding.

## C.

▉ The final issue in dispute involves Tri–County's decision to distribute the Quality Improvement funding it has designated towards Head Start payroll to only twelve of the fifty teachers eligible to receive an increased salary. In this instance, it is clear that the provisions of the collective bargaining agreements at issue here do apply to this decision regarding distribution of the funding. The relevant arbitration clause states that decisions regarding the distribution of Quality Improvement funding must be negotiated between Local 2327 and Tri–County. Under the *E.M. Diagnostic Systems, Inc.* test described earlier, this dispute is within the scope of the arbitration clause, there is no other provision of the collective bargaining agreements excluding this dispute from arbitration and there is no forceful evidence of an intent among the parties to exclude this dispute. 812 F.2d at 95. Unlike Tri–County's decisions regarding indirect costs and fringe benefits, the agency's decision to spend the funding on only a few of the teachers is a clear violation of its duty under the collective bargaining agreements to negotiate the distribution of funding and arbitrate any impasses over such distributions. Tri–County even seems to acknowledge this fact. In a letter dated June 6, 2002 from Albert B. Kelly, President of Tri–County, to Matthew Schottenfeld, an HHS administrator, Kelly discusses the state of the disagreement between Tri–County and Local 2327. Kelly states Tri–County's position that the level of fringe benefits and indirect costs cannot be negotiated with the union. He does not refer to the dispute over the distribution of the funding among teachers. (Mosley Aff.

Ex. C.) Kelly's failure to defend Tri–County's position regarding this portion of the dispute is certainly evidence that it did not feel it was required to distribute the funding in this way. Local 2327 was correct in demanding negotiation and possibly arbitration over this issue.

Tri–County claims in its brief to the court that any changes to its proposal to HHS will violate the law and may lead to a withdrawal of funding by HHS. The guidance letter to Tri–County from HHS states that, "we expect grantees to use these funds primarily to improve the salaries and fringe benefits of Head Start teachers. While grantees may propose to give all teachers some increase in salary, we urge you to pay particular attention to those teachers who, by virtue of their educational attainments, training, skills and 'employability' in other pre-school programs merit significant salary increases." (Mosley Aff. Ex. A.) There is nothing in this language requiring Tri–County to only give salary increases to those teachers with two year degrees in early childhood development. While this decision may certainly conform to the desires of HHS, it is not required and when combined with the requirements of the collective bargaining agreements it is clear that Tri–County had a duty to negotiate and possibly arbitrate any disputes over this distribution of funding.

Unfortunately, it is unclear from the record whether HHS has even approved the specific distribution of funding to the twelve teachers. Tri–County has failed to produce to this court its formal proposal to HHS and, as a result, this court cannot assume that HHS is even aware of which specific teachers are receiving salary increases. There is nothing in the record to demonstrate that Tri–County will lose its funding should a different method of distribution be negotiated, so long as the

funding is going towards Head Start teacher salaries. Certainly, Local 2327 has a vested interest in Tri–County retaining its funding and will not want to negotiate a compromise which jeopardizes the receipt of the funding. Therefore, Local 2327 and Tri–County are ordered to resume negotiations regarding the distribution of funding among the fifty Head Start teachers and shall follow the proper arbitration procedures should no compromise be reached.

## IV.

The final distribution of Quality Improvement funding between salaries, indirect costs and fringe benefits shall be determined as follows. The total amount of Quality Improvement funding for Head Start teachers received by Tri–Country from HHS is $48,182.00. Of that amount, 19.5%, or $9,395.49, will be allocated towards indirect costs. Of the $38,786.51 remaining from the original grant following the deduction for indirect costs, this court has directed that fringe benefit costs of 15% be deducted from total spending on the salaries of Head Start teachers. As a result, a total of $33,727.40 will be available for distribution towards the salaries of Head Start teachers and $5,059.11 will be allocated towards fringe benefits.[6] As discussed above, the distribution of that amount among the various Head Start teachers must be negotiated and possibly arbitrated between Local 2327 and Tri–County.

## V.

For the reasons set forth above, Plaintiff's application to enjoin Defendant from distributing Quality Improvement funding pending arbitration is denied. Defendant is directed to distribute $33,727.40 towards Head Start teacher salaries and is directed to commence negotiations with Plaintiff over the distribution of that $33,727.40 among the fifty Head Start teachers. Should negotiations fail to lead to a mutually acceptable distribution among the teachers, Plaintiff and Defendant are directed to comply with the proper arbitral procedures as agreed to in their collective bargaining agreements.

As there are no further disputes to be adjudicated by this Court, the order issued pursuant to this opinion shall be a final judgment. The Court will retain jurisdiction for the purpose of enforcing its order.

---

**6.** The appropriate algorithm is $x + .15x = \$38,786.51$ with $x$ equaling the direct salaries available for Head Start teachers.